WESTBY, and husband, Respondents, v. MADISON NEWS-
PAPERS, INC., and others, Appellants: DORGAN,
Defendant.

*No. 75-771. Argued November 2, 1977.—Decided
November 30, 1977.*
(Also reported in 259 N.W.2d 691.)

1

2

There were joint briefs by *Bradway A. Liddle, Jr.,* and *Boardman, Suhr, Curry & Field* of Madison, for appellant Madison Newspapers, Inc.; and *Earl Munson, Jr.,* and *La Follette, Sinykin, Anderson & Abrahamson* of Madison, for appellants The Capital Times Company, Miles McMillin, Elliott Maraniss, David Zweifel and Bruce Fritz, with oral argument by *Mr. Munson.*

For respondents there was a brief by *Thomas J. Rostad* and *Smith & Schultz* of Madison, and oral argument by *Mr. Rostad.*

BEILFUSS, C. J.    On February 15, 1975, an article "How Many Spies in Madison" was published in The Capital Times, a daily newspaper of general circulation. The article was accompanied by a photograph of one of the plaintiffs looking out a door toward an adjacent apartment that she was allegedly spying on.

The plaintiffs-respondents are Patricia A. Westby, a laborer and housewife, and William Westby her husband, a railroad engineer. The defendants-appellants are Madison Newspapers, Inc., The Capital Times, Miles McMillin, Elliott Maraniss, David Zweifel, supervisory officers, and Michael Dorgan[1] an employee, and Bruce Fritz a photographer, all of The Capital Times.

After the publication of the article and photograph the Westbys served a demand for retraction on The Capital Times as required by sec. 895.05 (2), Stats., a prerequisite to the libel action. They demanded that certain statements and the photograph, together with the printed statement of what it depicted, be retracted. In substance they demanded retraction of statements that they were

---

[1] Dorgan has not appealed nor appeared in this review.

paid government informers; that they were paid and instructed to spy on their neighbors, that they had told neighbors they were spies for a government agency and that they would neither confirm nor deny they were paid informants when asked by a reporter.

The amended complaint alleges in pertinent part:

"That on February 15, 1975, The Capital Times Company negligently and maliciously composed and supplied to Madison Newspapers, Inc., for publication in The Capital Times, a false and defamatory front page article of and concerning the plaintiffs entitled 'How Many Spies in Madison?', . . . said article consisting of a written story, a title and subtitle, and an 8½ × 3¾" photograph of the plaintiff Patricia A. Westby. . . .

". . . that the photograph of plaintiff Patricia A. Westby was taken and submitted to The Capital Times Company as a part of said article by defendant Bruce Fritz. . . ."

It further alleges that the article was written by defendant Michael Dorgan, and that it was reviewed and approved for publication by defendants Miles McMillin, Elliott Maraniss and David Zweifel.

The article is alleged to be false and defamatory as a whole, and specifically for referring to the Westbys as "spies" and "paid informants," for accepting pay to "spy on their neighbors," and for being described as leading "secret spy lives." The Westbys contend that the article

". . . carries a connotation and strongly implies that the plaintiffs are deceitful and dishonest, that they betray their neighbors and friends and cannot be trusted or confided in, that they lack integrity, and that they are stool pigeons. . . ."

The amended complaint further states that the claim that Patricia refused to answer a reporter's questions is defamatory because it implies that she did not deny the alleged activities. It also alleges the statement that the Westbys maintained "close relationships with the un-

suspecting activists" on the basis that this indicates that the Westbys did in fact spy on their neighbors and that they are contemptible, dishonest and double-crossers.

The article allegedly resulted in

". . . maliciously, negligently, and inexcusably exposing plaintiffs to public hatred, contempt, and ridicule, and impeaching plaintiffs' honesty, integrity, virtue, and reputations as members of the community."

The issues are (1) whether the newspaper article and photograph are capable of being defamatory as a matter of law; and (2) whether the complaint states a cause of action against the photographer.

█ The rule of law is that at the demurrer stage complaints should be given a liberal construction and the court should recognize any reasonable and favorable inferences which support a cause of action.[2]

In *Schaefer v. State Bar,* 77 Wis.2d 120, 122–23, 252 N.W.2d 343 (1977), this court outlined the basic law of libel:

"Initially, the court has the obligation of deciding whether a communication is capable of a defamatory meaning. . . .

"In *Lathan v. Journal Co.,* 30 Wis.2d 146, 152–53, 140 N.W.2d 417 (1966), we stated:

" 'Defamation has been defined as:

" ' " ". . . that which tends to injure 'reputation' in the popular sense; to diminish the esteem, respect, goodwill or confidence in which the plaintiff is held, or to excite adverse, derogatory or unpleasant feelings or opinions against him." Prosser, *supra,* page 756.

" 'In *Schofield v. Milwaukee Free Press Co.* (1905), 126 Wis. 81, 85, 105 N.W. 227, we held that for a newspaper article to be libelous it ". . . need only tend to degrade or disgrace the plaintiff generally, or to subject him to public distrust, ridicule, or contempt in the community. . . ."

---

[2] *Clark v. Corby,* 75 Wis.2d 292, 301, 249 N.W.2d 567 (1977).

" 'The Restatement, *supra,* page 140, sec. 559, provides that:

" ' "A communication is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." ' "

In *Schaefer v. State Bar, supra,* at 124, we stated:

" 'If the alleged communication is capable of a defamatory meaning, the demurrer must be overruled; and if the language is of such a character that it is capable of a nondefamatory meaning as well as a defamatory meaning, then a jury question is presented whether such communication was understood in fact in a defamatory sense by the persons to whom it was published. *Martin v. Outboard Marine Corp., supra.* If the communication cannot reasonably be considered defamatory or to be so understood, the demurrer must be sustained.' *Frinzi v. Hanson,* 30 Wis.2d 271, 275–76, 140 N.W.2d 259 (1966)."

The issue before this court then is whether The Capital Times' article was capable of being understood in a defamatory sense in the community by reasonable persons. In resolving this issue, words or elements of the article may not be viewed in isolation, but must be considered in context in relation to the whole.[3]

The article can be given the innocuous interpretation asserted by appellants: Namely that it sets out nothing more than a report that the Westbys were cooperating with responsible officials performing a lawful function; that the key words "spy" and "paid informants" are consistent with the unobjectionable, indeed laudable efforts of the Westbys, or any other citizens, to aid the police.

---

[3] *D. R. W. Corporation v. Cordes,* 65 Wis.2d 303, 313, 222 N.W.2d 671 (1974); *Frinzi v. Hanson,* 30 Wis.2d 271, 276, 140 N.W.2d 259 (1966).

The question is not whether the article could have been read as the newspaper contends it should be. Rather the question is whether the article could have been understood in a defamatory sense by members of the community where it was published.

Viewing the article as a whole, as we must, we are of the opinion that a jury could find it did excite adverse, derogatory feelings or opinions against the Westbys and lower them in the estimation of the community.

The article begins with references to congressional probes of federal "snooping." Thus it has at least a hint of investigative excesses on the part of federal authorities. It follows with the statements that the Westbys were asked to spy and in fact did so. These statements taken together could well be understood to mean that the Westbys were engaging in reprehensible snooping.

Even accepting the appellants' contention that the word "spy" has no particularly odious meaning, taken in the context of implied investigative impropriety and the fact that the Westbys were alleged to have spied on their neighbors, who are accused of nothing more than political activism, the word indicates that the Westbys were engaged in despicable conduct.

The article can be read as suggesting that the Westbys, persons who would spy on their neighbors on behalf of authorities, are unworthy of trust and confidence. Furthermore, the fact that they are accused of accepting compensation for their spying negatives appellants' claim that they were only doing what any good citizen would do. The phrase "paid informant" can be seen as labeling the Westbys as mercenary opportunists, violating the trust of their neighbors in spite of what the article terms "close relationships with the unsuspecting activists."

■

The newspaper cites several lower court decisions from foreign jurisdictions to support the proposition that libel cannot flow from a charge of lawful cooperation with proper authorities. These cases must be distinguished. They are slander cases and did not involve the publication of words like "spy" or "paid informants" to the community at large. The most important distinction is that all of them involved cooperation with law enforcement authorities against actual lawbreakers.

The appellants attempt to isolate the segments of the community which might view the Westbys with disdain as being so anti-social that the courts should not recognize them. The Westbys' neighbors were not criminals or even suspected criminals. Nor can the designation as political activists be a justification.

As the trial court noted:

"The accusations of spying for the FBI have been made at a time when the activities of that and other government agencies are being subjected to severe scrutiny as the result of disclosures of illegal and unwarranted intrusions into the privacy of many citizens. The publication was made in a major Madison newspaper, in a university community which has long exhibited a high degree of awareness and interest in the activities of government. In this context, the words used have the potential for causing reasonable and right-thinking citizens to look upon the plaintiffs [Westbys] with considerable disdain."

■

The important question is: Was the article, if false, of a nature which could have influenced others in the community to look upon the Westbys with scorn, as dishonest, deceitful, or untrustworthy. Whether they were actually viewed in this manner is a question for the jury. Giving the complaint the required liberal construction, it sets

forth a cause of action which warrants jury consideration.

The trial court held that the photographer, Fritz, was a proper party and cited *Wandt v. Hearst's Chicago American,* 129 Wis. 419, 109 N.W. 70 (1906), as authority for including a photograph accompanying an article as part of a single entity in a defamation action. We believe the issue is not whether the photograph may be properly considered as part of the article but rather whether a photographer who submits a nondefamatory photograph, which accompanies an arguably defamatory article, may be sued for libel.

There is nothing defamatory or false about the photograph. The Westbys admit that it is a picture of Patricia Westby. They object to the caption of the photograph, but do not specifically allege that the photograph itself is defamatory apart from the written article. Nor do they allege that Bruce Fritz had any knowledge that the picture was to accompany a defamatory article. They simply state that the photo was submitted "as a part of said article by defendant Bruce Fritz."

". . . one who contributes an article to a newspaper is not liable in an action for defamation for libelous matter inserted therein by the publisher of the paper." 50 Am. Jur.2d, *Libel and Slander,* p. 860, sec. 338.

This seems to be the case here. Fritz submitted a photograph, nondefamatory on its face, which was then inserted in an allegedly defamatory article.

What if Fritz had knowledge of the defamatory nature of the article prior to submission of the photograph? In *Arnold v. Ingram,* 151 Wis. 438, 138 N.W. 111 (1913), a person was found liable for the mere delivery of a libelous article from the writer to a newspaper. The intermediary had knowledge of the article's contents.

"Participation in publishing a libel is participation in the commission of tort, and the old and well known rule is that all who aid, advise, countenance, or assist commission of the tort are wrongdoers."

The simple allegation that the photograph ". . . was taken and submitted to The Capital Times Company as a part of said article by defendant Bruce Fritz. . . ," is not sufficient, even given a liberal construction, to imply that Fritz had any knowledge or control of the possible defamatory article.

The demurrer, insofar as it applies to the photographer Fritz, should be sustained; in all other respects the demurrer was properly overruled.

*By the Court.*—Order affirmed in part and reversed in part.

ABRAHAMSON, J., took no part.