**Archie E. SIMONSON, Plaintiff,**

v.

**UNITED PRESS INTERNATIONAL, INC. and the Associated Press, Inc., Defendants.**

**Civ. A. No. 78–C–220.**

United States District Court, E. D. Wisconsin.

Oct. 28, 1980.

Richard H. Schulz, Milwaukee, Wis., for plaintiff.

Andrew O. Riteris, Milwaukee, Wis., for defendant Associated Press.

John Dawson, Milwaukee, Wis., for defendant United Press.

## DECISION AND ORDER

TERENCE T. EVANS, District Judge.

This libel action is before the court on the motion of the defendants for summary judgment. The plaintiff is a former County Court Judge for Dane County, the county that includes the City of Madison, Wisconsin. On May 25, 1977, then–Judge Simonson sentenced a 15–year–old boy who, in January of 1977, had entered a "no contest" plea to the charge of second degree sexual assault on a 16–year–old girl at Madison West High School. The assault occurred in November, 1976. Certain statements attributed to the judge during the course of the dispositional hearing serve as the basis for this action.

The following exchange took place between the prosecutor, Meryl Manhardt, and Judge Simonson at the May 25, 1977 hearing:

"THE COURT: Might I inquire as to your recommendation? You mentioned a couple of things and you're emphasizing deterrence. I did not have the benefit of a full–blown trial and so the details surrounding this incident are unknown to me, they may be known to you, but they are unknown to me, and as I view it and I would like you to respond to this, as I view it, it would be one thing for the victim in this case to have been provocative, encouraging, and a party to the act with later regretting to do it, that would be one thing. That also would have an effect on the disposition of this case. It would be another thing if the victim of this act was a complete stranger and was, in a classic phrase of the word, gang raped, and that, of course, would influence the disposition of this matter. That detail is not before me and, perhaps, it should have been before me so that I would have, following your theory, I would have a better grasp of how this matter should be disposed of.

"And then you are saying that I should be responsive to the community in what their needs and wishes are. Well, how responsive should I be? Should I adopt a double standard? This community is well known to be sexually permissive; look at the newspapers, look at the sex clubs, the advertisements of sex, the availability of it through your escort services, the prostitutes, they are being picked up daily. Go down State Street and the University area. I used to see girls clothed like that and I had to pay a lot of money to go into the south side of Chicago to view what I see down on State Street today. Even in open court we have people appearing–women appearing without bras and with the nipples fully exposed and they think it is smart and they sit here on the witness stand with their dresses up over the cheeks of their butts and we have this type of thing in the schools. So, is that the attitude of the community? Am I supposed to be responsive to that? Are we supposed to adopt a double standard? Is this community then exhibiting the sex in the movies, in the sex stores we have now on State Street up around the square in the shows? I'm talking about the bars and the taverns where it is readily available, The Dangle Lounge, The Whiskey, wherever else they do their thing; down here on Williamson Street, Ms. Brew's, and the like. It is readily available. It is really wide open and are we supposed to take an impressionable person 15 or 16 years of age who can respond to something like that and punish that person severely because they react to it normally?

"What is the attitude of this community and what are their mores, what does exist? I know there is a group that has recently been attempting to clean it up. For them I think it is going to be an uphill fight because we haven't hit rock bottom yet but we will someday and then the pendulum will swing the other way and how are you going to deter acts like this absent some explanation of these influencing environmental factors. What response do you have?

"MS. MANHARDT: Your Honor, with all due respect, I find your remarks about women's clothing particularly sexist.

"THE COURT: You bet it is. I can't go around walking exposing my genitals like they can the mammary glands.

"MS. MANHARDT: You are reflecting the general theory that a woman provokes an assault and I cannot accept that idea.

"THE COURT: It sure raises a lot of interest in my mind from time to time.

"MS. MANHARDT: We are not talking about a consensual sex act, we are not talking about anything between adults, we are not talking about shows or magazines; we are talking about a personal assault and that's admitted to in the plea of no contest that was entered.

"THE COURT: It is one thing to enter a plea on a charge like this and another thing to address myself to a dispositional case. It is absolutely whether it is in a criminal setting or juvenile disposition taking into consideration the circumstances surrounding the act.

"MS. MANHARDT: There was an assault without consent on a 16 year old girl."

The judge rejected the prosecutor's request for placement outside of the community and accepted the suggestion of a social worker who was present at the hearing that the boy be allowed to return home to his parents under court supervision for a year.

The sexual assault at the high school in this case generated a significant amount of public interest in Madison. Present at the court hearing when the remarks quoted above were made was Anita Clark, a reporter for *The Wisconsin State Journal*, a Madison daily newspaper. A story with her by–line appeared in the following morning's edition of the paper.

In the evening of May 25, 1977, Associated Press reporter Ellen Porath wrote a news dispatch on the dispositional hearing, relying entirely on a computer printout of the Anita Clark article. At that time, the Clark article was merely in the stage of "proposed" for publication in the morning edition of *The Wisconsin State Journal*. The computer printout differed from the final published article in two respects: (1) the printout did not include this phrase which was parenthetically inserted into the *State Journal* story: "Simonson said later in the hearing that sexual assault obviously is not condoned by the community"; (2) the printout, but not the final article, characterized Simonson's comments as a "tirade". Therefore, the Associated Press dispatch transmitted by Porath to the Milwaukee AP Bureau did not contain the parenthetical phrase, but did contain a statement that the hearing "included a tirade" by the judge about provocative women's clothing. The Milwaukee Bureau rewrote the Madison dispatch for transmission on the broadcast wire to AP radio and television members.

A follow–up story written by Porath the next day was edited by the Milwaukee Bureau and transmitted to other AP members in Wisconsin, and to the AP general desk in New York. Both Porath and Timothy Curran, Day Editor of AP's Milwaukee Bureau, state in affidavits that they considered *The Wisconsin State Journal* and its reporters to be "highly reliable" news sources upon which the Associated Press could "consistently depend for accuracy."

The UPI also sent out a number of dispatches, including one transmitted in the evening of May 26, the day following the hearing. UPI Madison office staffers Harriet Leeds and Richard Jones prepared the dispatches transmitted on the UPI wires. In his affidavit, Jones stated that he not only relied on *The Wisconsin State Journal* account of the hearing, but also on a copy of a police investigative report concerning the assault at the high school. That report specifically stated that the 16–year–old girl was "raped" by the minor in question, assisted by two other minors. UPI Vice–President and Editor–in–Chief H. L. Stevenson states in his affidavit that the practice of reviewing local daily newspapers for news stories is a standard news gathering procedure for the UPI.

The defendants rely on several grounds in support of their summary judgment motions. The court will first consider whether dismissal is mandated by the plaintiff's failure to comply with the Wisconsin Retraction Statute, Sec. 895.05(2), Wis.Stats. It provides:

"Before any civil action shall be commenced on account of any libelous publication in any newspaper, magazine or periodical, the libeled person shall first give those alleged to be responsible or liable for the publication a reasonable opportunity to correct the libelous matter. Such opportunity shall be given by notice in writing specifying the article and the statements therein which are claimed to be false and defamatory and a statement of what are claimed to be the true facts. The notice may also state the sources, if any, from which the true facts may be ascertained with definiteness and certainty. The first issue published after the expiration of one week from the receipt of such notice shall be within a reasonable time for correction. To the extent that the true facts are, with reasonable diligence, ascertainable with definiteness and certainty, only a retraction shall constitute a correction; otherwise the publication of the libeled person's statement of the true facts, or so much thereof as shall not be libelous of another, scurrilous, or otherwise improper for publication, published as his statement, shall constitute a correction within the meaning of this section. A correction, timely published, without comment, in a position and type as prominent as the alleged libel, shall constitute a defense against the recovery of any damages except actual damages, as well as being competent and material in mitigation of actual damages to the extent the correction published does so mitigate them."

Before transferring this case to this branch of the court, Judge Robert Warren determined that the defendants' dispatches were "periodicals". Thus, they are covered by the statute.

Although the Wisconsin appellate courts have not directly determined what effect non–compliance with the statute would have on a court action, one recent Wisconsin Supreme Court decision indicates that compliance is a condition precedent to bringing a civil libel suit. *Westby v. Madison Newspapers, Inc.*, (1977), 81 Wis.2d 1, 3, 259 N.W.2d 691–describing 895.05(2) as "a prerequisite to the libel action".

The policy behind the statute appears to be the prompt correction of errors, mitigation of damage to reputation, and protection of media defendants from avoidable litigation. The Legislature has determined that a retraction "timely published, without comment, in a position and type as prominent as the alleged libel" effectively takes the issue of punitive damages away from the trier of fact. Retraction is also competent and material evidence admissible on the issue of mitigation of actual damages.

The court cannot speculate what effect an immediate demand for retraction and a retraction by the defendants would have had on this litigation. In conformity with the policy stated above, however, the court is satisfied that the Legislature intended § 895.05(2) to operate as a condition precedent to bringing a libel action in Wisconsin's courts.

In his brief, plaintiff challenges the statute as denying rights guaranteed under both the United States and Wisconsin Constitutions. Assuming constitutionality, another question becomes, can a litigant recover actual damages in court although he has not complied with the statute, with non–compliance being only a consideration on the issue of mitigation of actual damages? These questions need not be decided here in light of the court's rulings on the remaining issues.

Under Wisconsin law, if the statements complained of were in fact "substantially true", Simonson cannot recover simply because they were also defamatory. *Schaefer v. State Bar of Wisconsin*, 77 Wis.2d 120, 252 N.W.2d 343 (1977); *DiMiceli v. Klieger*, 58 Wis.2d 359, 206 N.W.2d 184 (1973); *Lathan v. Journal Company*, 30 Wis.2d 146, 140 N.W.2d 417 (1966).

"It is not necessary to prove the literal truth of the precise statement made. Slight inaccuracies of expression are immaterial provided that the defamatory charge is true in substance." *Restatement, 3 Torts*, p. 218, Sec. 582; *Lathan v. Journal Company, supra*, at 158, 140 N.W.2d 417. See, Prosser, *Law of Torts*, Sec. 116, p. 798 (4th Ed. 1971).

Of course, the defendants may offer proof that the statements were substantially true. However, the burden ultimately rests upon the public official to establish the falsity of the statements. *Meiners v. Moriarity,* 563 F.2d 343, 351 (7 Cir. 1977); *Garrison v. Louisiana,* 379 U.S. 64, 74, 85 S.Ct. 209, 215, 13 L.Ed.2d 125 (1964); *Rosenblatt v. Baer,* 383 U.S. 75, 84, 86 S.Ct. 669, 675, 15 L.Ed.2d 597 (1966).

■ There were inaccuracies in the reporting of Judge Simonson's remarks. There were also some misunderstandings evident as to juvenile court procedures, the effect of a "no contest" plea, the complexities of the recently–enacted Wisconsin Sexual Assault law, and the effect of the Judge's comments on the disposition of the case then before him. Considered as a whole, however, the inaccuracies were slight and I am satisfied that the reports were "true in substance".

One could become involved in an endless game of semantics in determining when a "sexual assault" is not a "rape"; when a judge "rules" and when he merely "opines" or "holds"; whether one went into a "tirade", "outburst", "sharp attack", or simply made "strong comments". It could also be debated at length whether or not the comments, and the beliefs underlying them, had any effect on the disposition of the case before Judge Simonson. Whatever the conclusions about was was said, the various interpretations adopted by the *Wisconsin State Journal* reporter, and by the defendants' reporters, correctly related the "gist" or "substantial truth" of Judge Simonson's remarks; that being the strong statement of his personal belief that provocative female dress and sexual permissiveness in Madison had an impact on the sex drive of male youths.

When one reads the statute to which the juvenile pled "no contest" and under which he was adjudged "delinquent", Sec. 940.-225(2)(e), Wis.Stat.; the allegations on the face of the petition to which the juvenile pled and stipulated to for "probable cause" purposes; and the plaintiff's written decision dated December 17, 1976 denying the motions of all three juveniles to dismiss the charges against them, one could reasonably conclude that what the juvenile pled "no contest" to was, in layman's terms, nothing short of "rape".

A reading of the transcript of Judge Simonson's comments could easily lead one to conclude that he did, in fact, go into a "tirade" on the issue of sexual permissiveness.

The comments were relevant to the proceedings, and made at a point in the proceedings when one could reasonably conclude they affected the disposition of the case and were in the nature of a "ruling" from the bench.

The words used in the AP and UPI stories were not the most accurate nor were they completely synonymous with what was said. The words used in the stories tended to be inflammatory in nature. They were not, however, false.

■ Under Wisconsin law, the defendants have an unconditional privilege to publish a "true and fair report of any judicial … proceeding authorized by law …" Sec. 895.05(1), Wis.Stats. *Williams v. Journal Company,* 211 Wis. 362, 247 N.W. 435 (1933); *Lehner v. Berlin Publishing Company,* 209 Wis. 536, 245 N.W. 685 (1932). The policy underlying this privilege is as follows:

"… The whole foundation for that privilege is the interest of the public to know that the conduct of judicial officers and legislators, to the end that misconduct or incapacity may be promptly discovered and remedied. This end has been deemed so vital to public welfare and to the maintenance of good government as to demand subordination of the interest of individuals adverse to the publicity of defamatory statements against them which must otherwise control." *Ilsley v. Sentinel Company,* 133 Wis. 20, 24–25, 113 N.W. 425 (1907).

The court has already found the news dispatches in question to be substantially true. I also find the reports to be "true and fair" reports of the judicial proceedings involved. Therefore, they were protected by the Wisconsin privilege. The inaccuracies

and embellishments as to what occurred at the dispositional hearing are not sufficient to render the reports untruthful and unfair. Therefore, the court finds no genuine issue raised as to the existence of a privilege protecting the defendants from liability for their reporting of this judicial proceeding.

■ Finally, even assuming the falsity of the reports in question, the court is satisfied that the plaintiff has not even come close to raising a genuine issue as to the existence of actual malice on behalf of the defendants or their reporters.

■ A public official cannot recover damages in a libel action for defamatory falsehoods relating to his official conduct unless he or she can prove that the false statements were made with actual malice; that is, the statements were made with knowledge that they were false, or with reckless disregard of whether or not they were false. *New York Times v. Sullivan*, 376 U.S. 254, 279–80, 84 S.Ct. 710, 725–26, 11 L.Ed.2d 686 (1964); *Fadell v. Minneapolis Star & Tribune Company, Inc.*, 557 F.2d 107, 108 (7 Cir. 1977); *Grzelak v. Calumet Publishing Company, Inc.*, 543 F.2d 579, 582 (7 Cir. 1975).

Mr. Simonson contends that (a) he was not a public official, or (b) that he was not acting in his official capacity when the statements were made. Both contentions are without merit.

■ The definition of who is a "public official" is a matter of federal, not state, law. *Rosenblatt v. Baer*, 383 U.S. 75, 84, 86 S.Ct. 669, 675, 15 L.Ed.2d 597 (1966). It is for the trial judge in the first instance to determine whether the proofs show the plaintiff to be a public official. *Id.*, at 88, 86 S.Ct. at 677.

As stated by the United States Supreme Court in *Rosenblatt v. Baer*, at 85–6, 86 S.Ct. at 675–76:

"... There is, first, a strong interest in debate on public issues, and, second, a strong interest in debate about those persons who are in a position significantly to influence the resolution of those issues. Criticism of government is at the very center of the constitutionally protected area of free discussion. Criticism of those responsible for government operations must be free, lest criticism of government itself be penalized. It is clear, therefore, that the 'public official' designation applies at the very least to those among the hierarchy of government employees who have, or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs.

"This conclusion does not ignore the important social values which underlie the law of defamation. Society has a pervasive and strong interest in preventing and redressing attacks upon reputation. But in cases like the present, there is tension between this interest and the values nurtured by the First and Fourteenth Amendments. The thrust of *New York Times* is that when interests in public discussion are particularly strong, as they were in that case, the Constitution limits the protections afforded by the law of defamation. Where a position in government has such apparent importance that the public has an independent interest in the qualifications and performance of the person who holds it, beyond the general public interest in the qualifications and performance of all government employees, both elements we identified in *New York Times* are present and the *New York Times* malice standards apply."

In his capacity as a County Court Judge, the plaintiff had substantial responsibility for or control over the conduct of governmental affairs. The public had an independent interest in his qualifications and performance. See, *Garrison v. Louisiana*, 379 U.S. 64, 76, 85 S.Ct. 209, 216, 13 L.Ed.2d 125 (1964); *Rinaldt v. Holt, Rinehart & Winston, Inc.*, 42 N.Y.2d 369, 397 N.Y.S.2d 943, 366 N.E.2d 1299 (1977), *cert. den.* 434 U.S. 969, 98 S.Ct. 514, 54 L.Ed.2d 456 (1977); *Meiners v. Moriarity, supra*.

As this case demonstrates, the public has a strong independent interest in the qualifications and performance of juvenile court judges. The sexual assault case before Judge Simonson generated public interest

and the disposition of the case was a matter of concern to the Madison community.

Judge Simonson's statements were made while he was acting in his official capacity as a Juvenile Court Judge. They came at the point of the proceedings when the attorneys and the social worker were stating their positions as to what would be the best disposition of the case. His comments related directly to the remarks by the prosecutor about the societal interests of punishment and deterrence of the juvenile's acts. Whether his comments in any way affected the ultimate disposition of the case is not important. The fact is, his comments described his views regarding the effects of a sexually permissive society and provocative dress on the juvenile sex drive—matters of public concern that were relevant to the juvenile dispositional hearing then before him as a judge.

■ The plaintiff raises a novel argument claiming the lack of a transcript and the secrecy attending juvenile court proceedings prevented him from obtaining media access usually afforded public officials and, therefore, the *New York Times v. Sullivan* doctrine should not apply to him. Creation of such a rule would be inappropriate, particularly in this case where the depositions of the plaintiff clearly indicate extensive access to virtually all major local and national media outlets within a few days after the hearing.

Judge Simonson concedes that he appeared on numerous television talk shows, including the Phil Donahue Show, the Today Show, Good Morning America, and the Tomorrow Show in order to discuss his remarks and opinions on sexuality in society. He also participated in numerous radio talk shows in such cities as Boston, New York, Washington, Philadelphia, San Francisco, Dallas–Fort Worth, Miami, Montreal, London, Tokyo and Perth, Australia. Plaintiff gave interviews to Madison reporters on May 26 or 27, 1977, and granted an interview to a reporter from the *Washington Post.* Further, plaintiff spoke to local Madison church groups, private citizens and service organizations such as the Lions, Kiwanis, Rotary Club and the Optimists. He also gave an interview to *People* magazine which was reported in its June 13, 1977 issue. Against this background of media access, his claim that the *New York Times v. Sullivan* standard does not apply to him because of the secrecy of the court proceedings has no merit.

■ As a public official, Judge Simonson must shoulder the burden of proving actual malice. The burden rests on him, even at the summary judgment stage, to establish with convincing clarity that actual malice existed. *Fadell v. Minneapolis Star & Tribune, supra,* at 108; *Carson v. Allied News Company,* 529 F.2d 206, 210 (7 Cir. 1976).

A footnote to a recent United States Supreme Court decision has raised some question as to the vitality of the long–established "rule" that summary judgment is the preferred procedure for handling the *New York Times* "actual malice" issue. See, *Hutchinson v. Proxmire,* 443 U.S. 111, 120 n.9, 99 S.Ct. 2675, 2680, 61 L.Ed.2d 411 (1979); see, *Nader v. deToledano,* 408 A.2d 31 (D.C.App.1979), *cert. den.* 444 U.S. 1078, 100 S.Ct. 1028, 62 L.Ed.2d 761 (1980).

The court, however, is satisfied that the plaintiff can neither prove actual malice with "convincing clarity", *Fadell, supra,* nor that under normal summary judgment standards there is a genuine issue as to the material fact of actual malice. Therefore, the defendants are entitled to judgment as a matter of law. F.R.C.P., Rule 56(c).

As stated by the Seventh Circuit in *Grzelak v. Calumet Publishing Company, supra,* at 582:

"... The concept of recklessness, as it is used to define *New York Times* malice, requires that the publisher act with a 'high degree of awareness of ... probable falsity' in printing the subject matter in question, *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789

(1974); *Garrison v. Louisiana*, 379 U.S. 64, 74, 85 S.Ct. 209, 215, 13 L.Ed.2d 125 (1964). It is clear that 'mere proof of failure to investigate, without more, cannot establish reckless disregard for the truth.' *Gertz, supra*, 94 S.Ct. at 3003; *Beckley Newspapers Corp. v. Hanks*, 389 U.S. 81, 84–5, 88 S.Ct. 197, 199–200, 19 L.Ed.2d 248 (1967). Rather, the defendant must, in fact, entertain serious doubts as to the truth of the publication to be guilty of recklessness. *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968)."

The defendants have submitted proof that they were not present at the dispositional hearing, and that they relied entirely on the *Wisconsin State Journal* story by Anita Clark. No transcript or court records were immediately available. The defendants did not conduct any independent investigation, as this was a "hot news" item about a matter of significant public concern which required immediate reporting. It can also not be disputed that the plaintiff did in fact make strong statements at the hearing about what he perceived to be sexual permissiveness in Madison and its effect on juveniles. In essence, the defendants are "guilty" of reliance on the Anita Clark article and nothing more.

To counter this, the plaintiff does not challenge the reliability of Anita Clark, nor does he challenge the substantial truth of her article as it appeared in the *Wisconsin State Journal*. The plaintiff seeks to prove actual malice through the various editorial processes which he claims falsified, inflamed, and distorted.

The nature of the wire services is such that the dissemination of news to subscribers across the country necessitates editing, summarizing, selection of facts and eye-catching phrases, and reliance on second-hand sources for material. Mere proof that such processes were in fact used, absent any showing that such processes were recklessly abused, does not overcome the First Amendment hurdle. *See, Gay v. Williams*, 486 F.Supp. 12 (D.Alaska, 1979).

The inaccuracies in the follow-up stories after the hearing are readily explained by the reliance on the Clark article, the absence of a transcript, and the unavailability of court records. It should be noted that these stories included the plaintiff's version of the events, as well as his statement that he stood behind his comments.

Accuracy and objectivity are the journalistic ideals. As a practical matter, however, the editorial processes occasionally shape, slant, color, omit, and misstate to some degree. "... Factual error is inevitable in free debate and must be countenanced in order to give freedom of expression 'breathing space'. *New York Times Company v. Sullivan*, 376 U.S. 254, 271–2, 84 S.Ct. 710, 721–22, 11 L.Ed.2d 686 (1964)." *Fadell v. Minneapolis Star & Tribune Company, supra*, at 109.

The plaintiff has established the effect of the editorial processes on his comments. He has not, however, countered the proof of the defendants that whatever inaccuracies or coloration occurred were unintended by-products of the editorial process. Even if the evidence is viewed in a light most favorable to the plaintiff, and drawing all reasonable inferences therefrom, the court is satisfied that no actual malice is present.

For all of the above reasons, therefore,

IT IS ORDERED that the motion of the defendants for summary judgment is granted and this action is dismissed.