**Lynette HARRIS, Plaintiff,**

v.

**Betty Ewens QUADRACCI, James Romenesko, David A. Fryxell, Quad/Creative, Inc., and Dennis M. Casey, Defendants.**

Civ. A. 93–C–102.

United States District Court, E.D. Wisconsin.

June 29, 1994.

Robert Sutton, Milwaukee, WI, for plaintiff.

Brady C. Williamson, LaFollette & Sinykin, Madison, WI, for Quadracci and Romenesko.

Charles Scarlata, Pittsburgh, PA, Terry Mitchell, Mitchell, Baxter & Ziegler, S.C., Milwaukee, WI, for Casey.

### ORDER

TERENCE T. EVANS, Chief Judge.

This defamation action concerns an article published in *Milwaukee Magazine* and written by defendant James Romenesko. The plaintiff, Lynette Harris, claims that the article, entitled "Runaway Twin: Lynnette Harris takes her biographer on a frightening journey," contains seven defamatory statements about her. Her biographer, defendant Dennis Casey, is quoted in the article as having made certain comments. Ms. Harris brings this lawsuit against Casey, Romenesko, Quad/Creative, Inc., the owner of *Milwaukee Magazine*, and the magazine's publisher, Betty Ewens Quadracci. David A. Fryxell, a former editor of *Milwaukee Magazine*, is also named as a defendant in this case. Mr. Fryxell has not been serviced with process, however, and all claims against him are DISMISSED.

The facts are undisputed. In 1989, Harris and her twin sister, Leigh Ann Conley, were prosecuted for tax evasion in federal court here in the Eastern District of Wisconsin. The sisters were charged with willful failure to report as income money they received from an elderly widower—millionaire David Kritzik. They were convicted in trials conducted by District Judge Thomas J. Curran. Harris was sentenced to serve 10 months in prison, to be followed by 2 months in a halfway house and 2 years of supervised release. She was also fined $12,500 and ordered to pay $150 in court costs.

In 1991, the Court of Appeals for the Seventh Circuit reversed the convictions of both sisters, holding that the money they received—each apparently more than half a million dollars over several years—was a gift, not income, for tax purposes. *See United States v. Harris*, 942 F.2d 1125 (7th Cir. 1991).

Given this mix—a rich old man, attractive twin sisters, and lots of money—many in the media smelled a juicy story. This case is about one that Romenesko wrote for the February 1992 issue of *Milwaukee Magazine*. A copy of the article is attached to the end of this decision.

Mr. Romenesko's article describes the experiences of Mr. Casey, a Pittsburgh journalist, who befriended Harris while she was in prison because he says he was interested in writing an article about her. He now is the author of a book about Harris, her relation-

ship with her twin sister, the federal tax case, and the elderly and generous Mr. Kritzik.

A few months prior to the article's publication, Casey called Romenesko to get a copy of another article previously written by Romenesko about Harris entitled "The Gold Digger," which appeared in the July 1990 issue of *Milwaukee Magazine.* After speaking with Casey several times, Romenesko wrote "Runaway Twin."

Currently pending are two motions for summary judgment, both by defendants. I will first address the motion by the media defendants, Romenesko, Quadracci, and Quad/Creative, and then the motion by Casey.

Summary judgment is appropriate if there is no genuine issue of material fact and the evidence shows that the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). The movant has the burden of showing that there is no genuine issue of fact. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). Because the moving party has the burden, all evidence must be viewed in a light most favorable to the nonmoving party, and that party must receive the benefit of all reasonable inferences to be drawn from the underlying facts. *Fitzsimmons v. Best,* 528 F.2d 692, 694 (7th Cir. 1976). The nonmoving party, however, may not rest upon the mere allegations or denials in its pleading; it must affirmatively demonstrate, by specific factual showings, that there is a genuine issue of material fact requiring trial. Fed.R.Civ.P. 56(e); *Anderson,* 477 U.S. at 247–48, 106 S.Ct. at 2509–10. The requirement of a genuine issue of fact means that the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

Defamation actions against the media illustrate the tension between the public's need for the press to operate in a free manner and the individual's interest in compensation from harm to reputation inflicted by defamatory statements. Over the years, the Supreme Court has focused on the distinction between defamation actions brought by private individuals and those brought by public individuals. In an attempt to balance the competing interests of the public, the press, and individuals, the Court announced in the landmark case *New York Times Co. v. Sullivan* that "public officials" are required to prove "actual malice" to recover damages. 376 U.S. 254, 279–80, 84 S.Ct. 710, 725–26, 11 L.Ed.2d 686 (1964).

The Court has since extended the first amendment protection afforded to the media in *New York Times* to actions brought by "public figures," who are not officials, but are persons involved in matters of public concern and controversy. *See Curtis Publishing Co. v. Butts,* 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967). In *Gertz v. Robert Welch, Inc.,* the Court created two subclassifications of public figures. 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). The first classification, public figures for all purposes, are individuals who have attained "roles of especial prominence in the affairs of society" or who occupy "positions of ... persuasive power and influence." *Id.* at 342, 345, 94 S.Ct. at 3008, 3009. However, the Court noted that general public figures are rare. People like O.J. Simpson probably fit the description. More common, however, are persons who fall under the second classification articulated in *Gertz,* people who are public figures for a limited purpose. A person becomes a public figure for a limited range of issues when she "voluntarily injects" herself or "is drawn into a particular public controversy." *Id.* at 351, 94 S.Ct. at 3013.

The status of a plaintiff in a defamation action against the media determines whether the plaintiff must prove negligence or meet the higher standard of proof articulated in *New York Times.* Whether Harris is a public figure for purposes of a defamation action is a question that I must decide as a matter of law. *Rosenblatt v. Baer,* 383 U.S. 75, 88, 86 S.Ct. 669, 677, 15 L.Ed.2d 597 (1966); *Lewis v. Coursolle Broadcasting,* 127 Wis.2d 105, 111, 377 N.W.2d 166, 172 (1985).

I must first ask whether Ms. Harris is a public figure for all purposes. The Wisconsin Supreme Court has adopted a community standard to measure the plaintiff's fame or

notoriety in defamation cases. *Lewis,* 127 Wis.2d at 118, 377 N.W.2d 166. Like many other courts, it has interpreted the general public figure category articulated in *Gertz* as imposing some specific geographical context as a limit. Under this standard, the plaintiff is not required to have achieved nationwide fame; "[r]ather, the question is whether the individual had achieved the necessary degree of notoriety where he was defamed—*i.e.,* where the defamation was published." *Waldbaum v. Fairchild Publications,* 627 F.2d 1287, 1295–96 n. 22 (D.C.Cir.), *cert. denied,* 449 U.S. 898, 101 S.Ct. 266, 66 L.Ed.2d 128 (1980).

■ In determining whether Ms. Harris has achieved the degree of notoriety necessary to become a general public figure, I look to a number of factors, including previous press coverage, name recognition, and whether she shunned the attention of the public. Harris describes herself as being "pretty well-known" in the Milwaukee area as a model and actress before she was prosecuted for tax evasion. She appeared in various Milwaukee newspapers in advertisements, on local television, and in two nationally distributed motion pictures. In addition, she promoted her career through *"Playboy"* models and appeared in *Playboy* magazine on four different occasions. Harris attests that she actively endeavored to keep her name in the public eye in order to foster her career.

Much of the publicity about Ms. Harris derives from her prosecution for tax evasion. The case received considerable media coverage in the Milwaukee area and, to a lesser extent, in other areas of the country. In that regard, Ms. Harris granted numerous interviews and appeared on several national television shows, including "Larry King," "Oprah Winfrey," "Inside Edition," and "Entertainment Tonight." She did not shun the public. Rather, she often invited comment by using press coverage to respond to the controversy. Although Ms. Harris complains in this suit that Mr. Romenesko's article casts an unfavorable light on her, because of her own activities she must accept the wisdom of the court in *Waldbaum* where it noted that "[w]hen someone steps into the public spot-light, or when he remains there once cast into it, he must take the bad [publicity] with the good." 627 F.2d at 1294–95. Fame, with its accompanying closer scrutiny, does not always bring favorable comment.

Harris's access to the media and her voluntary participation in public debate surrounding the controversy weigh in favor of finding that she is a public figure for all purposes. In her deposition, for instance, Ms. Harris states that she "cannot go anywhere without being recognized," and that she is somewhat of a celebrity in Milwaukee. But this is not quite enough, in my view, to make her a public figure for all purposes. Consequently, I will consider whether she is a public figure for a narrower range of issues.

■ Ms. Harris contends that she is not even a limited purpose public figure because she did not voluntarily thrust herself into the spotlight. This contention is without merit. In *Denny v. Mertz,* 106 Wis.2d 636, 318 N.W.2d 141, *cert. denied,* 459 U.S. 883, 103 S.Ct. 179, 74 L.Ed.2d 147 (1982), the Wisconsin Supreme Court emphasized the voluntariness of the plaintiff's role in the controversy. But several years later in *Wiegel v. Capital Times Co.,* the state court of appeals rejected voluntariness alone as dispositive on the issue and stated that voluntary injection is only one way of becoming a limited public figure. 145 Wis.2d 71, 84–86, 426 N.W.2d 43 (Ct.App.1988). It recognized that an individual may be an "involuntary public figure" when she is directly affected by the actions of public officials. *Id.; see also* Lawrence Tribe, *American Constitutional Law* 880 (2d ed. 1988). For example, a defendant in a criminal case would be a public figure as to news items concerning his case. The court announced that "the focus of the inquiry should be on the plaintiff's role in the public controversy rather than on any desire for publicity or other voluntary act" on her part. *Wiegel,* 145 Wis.2d at 85, 426 N.W.2d 43. In addition, although she no longer gives interviews, Ms. Harris has ample access to the media to rebut any assertions. *See id.* at 88, 426 N.W.2d 43; *Waldbaum,* 627 F.2d at 1295 n. 21.

■ Even if Ms. Harris did not voluntarily thrust herself into the controversy, she may be considered a limited purpose public figure if her activities "almost inevitably put [her] into the vortex of a public controversy." *Id.* at 85, 426 N.W.2d 43 (citation omitted). Wisconsin courts have adopted a three-step inquiry employed by federal courts to determine whether the plaintiff may be considered a limited purpose public figure. *Van Straten v. Milwaukee Journal,* 151 Wis.2d 905, 913, 447 N.W.2d 105 (Ct.App.1989), *cert. denied,* 496 U.S. 929, 110 S.Ct. 2626, 110 L.Ed.2d 646 (1990). The three steps include: (1) isolating the controversy; (2) determining that the plaintiff's role in the controversy is more than trivial or tangential; and (3) ascertaining if the alleged defamation is germane to the plaintiff's participation in the controversy. *Id.* at 913–14, 447 N.W.2d 105.

■ The first step is to determine the scope of the controversy because it defines the scope of Ms. Harris's public personality. I find the controversy surrounding her to be somewhat broad; it encompasses all aspects of the trial process, including her relationship with her sister and Kritzik, and any information that came out in interviews or articles. The second step is an easy one. Harris's role in the controversy as the defendant is clearly more than tangential or trivial. Finally, Harris argues that the article at issue is not germane to her participation in that controversy. I disagree. By agreeing to work with Casey on a book, Ms. Harris continued to influence the outcome of the public controversy. Even if she was caught up in the controversy involuntarily, she did not reject any role in the debate. In fact, through media coverage she sought to reply to what she considered misstatements made about her. Ms. Harris acknowledges· that she worked with Casey on the book because she hoped it would present her side of the controversy. Romenesko's article is about Harris and the circumstances surrounding her participation in helping Casey write the book. It is germane to her role in the controversy.

■ I find that as a matter of law Ms. Harris is at least a limited purpose public figure. As such, Ms. Harris must prove that the media made the defaming statement with "actual malice—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times,* 376 U.S. at 279–80, 84 S.Ct. at 726; *Lewis* 127 Wis.2d at 119, 377 N.W.2d 166. The *New York Times* malice standard is well-established and is subject to a clear and convincing standard of proof. *Anderson,* 477 U.S. at 255–56, 106 S.Ct. at 2513–14; *Gertz,* 418 U.S. at 342, 94 S.Ct. at 3008.

■ Actual malice cannot be presumed; it is a subjective standard that is not met by evidence suggesting the defendant lacked reasonable grounds. *Garrison v. Louisiana,* 379 U.S. 64, 78–79, 85 S.Ct. 209, 217–18, 13 L.Ed.2d 125 (1964). Furthermore, the *New York Times* standard of actual malice should not be confused with the understanding of malice as an evil intent. *Masson v. New Yorker Magazine, Inc.,* 501 U.S. 496, 510, 111 S.Ct. 2419, 2429, 115 L.Ed.2d 447 (1991). To show reckless disregard for the truth, a plaintiff must prove either that a defendant "in fact entertained serious doubts" about the truth of a publication, *St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968), or made false statements of fact with a "high degree of awareness of their probable falsity." *Garrison,* 379 U.S. at 74, 85 S.Ct. at 216. Whether the evidence is sufficient to support a finding of actual malice is a question of law. *Harte–Hanks Communications, Inc. v. Connaughton,* 491 U.S. 657, 685, 109 S.Ct. 2678, 2694, 105 L.Ed.2d 562 (1989); *Lewis,* 127 Wis.2d at 120, 377 N.W.2d 166.

■ Ms. Harris cannot satisfy her burden of proving actual malice. She has not alleged malice in her complaint, nor has she produced any evidence of actual malice. She has submitted an affidavit by an "expert" journalist, Dane Claussen. In his affidavit, Claussen concludes Romenesko wrote and *Milwaukee Magazine* published the article with a reckless disregard for the truth. His affidavit is cast as an objective opinion which concludes that Mr. Romenesko failed to adequately investigate the veracity of his "biased" source, Mr. Casey. But "mere proof of failure to investigate the accuracy of a state-

ment, without more, cannot establish reckless disregard for the truth." *Van Straten,* 151 Wis.2d at 918, 447 N.W.2d 105; *Gertz,* 418 U.S. at 332, 94 S.Ct. at 3003. Moreover, expert opinion testimony generally is not helpful when determining actual malice against a subjective standard. *See Brueggemeyer v. American Broadcasting Cos.,* 684 F.Supp. 452, 466 (N.D.Tex.1988). For example, Claussen states "Mr. Romenesko appears to have recklessly believed those statements of Dennis Casey." Actual malice focuses on knowledge of falsity and serious doubts as to the truth of the statement. The Claussen affidavit is not probative of actual malice because Claussen's opinion relates to a reckless disregard for a standard of objectivity, not for the truth. It fails to put Romenesko's conduct in material dispute or raise a genuine issue as to the existence of actual malice on behalf of Romenesko, Quadracci, or Quad/Creative, Inc.

Ms. Harris has failed to meet her burden of proving by clear and convincing evidence the existence of material disputed facts on the issue of actual malice. Accordingly, defendants Romenesko, Quadracci, and Quad/Creative, Inc. are entitled to judgment as a matter of law. Their motion for summary judgment is GRANTED and the claims against them are DISMISSED.

I now turn to the claim against Casey, who, although a journalist, is a "nonmedia" defendant in this case. Which standard applies to nonmedia defendants raises an interesting question. The Supreme Court has declined to rule on whether the *New York Times* malice standard applies when the defendant is a nonmedia, private individual. It has recast the inquiry as one which shifts the focus from the status of the defendant to the subject matter of the speech involved. *Dun & Bradstreet v. Greenmoss Builders, Inc.,* 472 U.S. 749, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985). Rather than deciding whether the distinction between media and nonmedia defendants is constitutionally significant, a plurality of the Court distinguished between matters of public interest and those of private interest. *Philadelphia Newspapers, Inc. v. Hepps,* 475 U.S. 767, 779 n. 4, 106 S.Ct. 1558, 1565 n. 4, 89 L.Ed.2d 783 (1986)

(noting that Court had no need to consider what standard would apply if plaintiff sues a nonmedia defendant). *See also Hutchinson v. Proxmire,* 443 U.S. 111, 133 n. 16, 99 S.Ct. 2675, 2687 n. 16, 61 L.Ed.2d 411 (1979) (same).

Wisconsin case law indicates that a Wisconsin court would not afford the *New York Times* malice standard to nonmedia defendants. In *Denny,* the Wisconsin Supreme Court declined to read *Gertz* as affording first amendment protection to nonmedia defendants and held that the nonmedia defendant's liability for the statement at issue in that case be determined according to the state's common law of defamation. 106 Wis.2d at 660–61, 318 N.W.2d 141. As a matter of judicial restraint and because Casey is entitled to summary judgment on separate and independent grounds, I will avoid addressing the constitutional issue. Instead, I will review Harris's claims against Casey under the common law defamation standard.

▆▆▆ In Wisconsin, a communication is defamatory if it tends to harm the reputation of another "so as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Frinzi v. Hanson,* 30 Wis.2d 271, 275, 140 N.W.2d 259 (1966) (citing *Restatement (2d) of Torts,* § 559 (1977)). Whether the language is capable of conveying a defamatory meaning is a question of law. *Id.* at 275–76, 140 N.W.2d 259. Also, Ms. Harris cannot recover damages "if the statements complained of were in fact substantially true." *Simonson v. United Press Int'l, Inc.,* 500 F.Supp. 1261, 1265 (E.D.Wis.1980), *aff'd,* 654 F.2d 478 (7th Cir.1981) (citations omitted). The burden of proving the substantial truth of a statement is placed on the defendant. *Denny,* 106 Wis.2d at 661 n. 35, 318 N.W.2d 141.

▆▆▆ Casey argues that some of the statements are not defamatory because they are opinions. Although the Supreme Court has refused to give any special first amendment protection for statements of opinion, a statement generally is actionable only when it contains or implies a statement of provably false fact. *See Milkovich v. Lorain Journal*

*Co.,* 497 U.S. 1, 19–20, 110 S.Ct. 2695, 2706–07, 111 L.Ed.2d 1 (1990).[1]

Casey has presented evidence in an attempt to establish the substantial truth of each of the seven allegedly defamatory statements. A review of that evidence and the statements reveals that none of the statements are actionable as defamatory, either because no factual dispute exists as to truth, there is no way to prove falsity, the statement is not attributable to Casey, or it is incapable of defaming Harris.

■ The first statement Ms. Harris points to as defamatory reads:

**But by the end, says Casey, a Pittsburgh writer and television political analyst, Harris transformed from a cooperative source into a frightening extortionist.**

This is not a quote attributable to Casey. Rather, the record indicates that it is a characterization or conclusion that Romenesko reached, primarily based on speaking with Casey and listening to a tape of telephone messages left on Casey's answering machine. Moreover, Harris admits that she left six messages on Casey's answering machine threatening that if he did not pay her money she would tell his wife and friends that he made sexual demands of her. In her deposition, Harris admitted that anyone who heard the tape "could reasonably interpret it as being an attempt at extortion." Because Casey is not responsible for the comment, he is entitled to summary judgment as a matter of law.

■ The second allegedly defamatory statement concerns the circumstances of Harris's trial and appeal:

*Playboy* **models Harris and her twin sister, Leigh Ann Conley, were convicted in federal court in 1990 of failing to pay taxes on millions of dollars from Kritzik. A federal appeals court overturned the verdict last year, accepting the twins' argument that money from the octogenarian was a gift and thus not taxable.**

Nothing in this statement is attributable to Casey. It is information that Romenesko says he gathered from court records. Harris argues that the statement is false because it asserts that she and her sister received "millions of dollars" from Kritzik, when she was charged with failing to pay taxes on only $600,000. Her argument fails for two reasons. First, the actual amount in controversy for her and her sister totaled over $1 million. Second, any error in the precise amount would not alter the statement's substantial truth nor would it have any "different effect on the mind of the reader from that which the pleaded truth would have produced." *John v. Journal Communications, Inc.,* 801 F.Supp. 210, 212 (E.D.Wis. 1992) (citing *Masson,* 501 U.S. at 517, 111 S.Ct. at 2433). Accordingly, this statement is not defamatory.

■ The subject of the third allegedly defamatory statement is Casey's initial interest in Harris's story:

**Casey was tipped off to the story by a friend who knew he was interested in tax law.**

This statement is incapable of defaming Harris because it does not refer to her nor does it carry any negative connotation with it so as to diminish her reputation. Even if this statement is false, it cannot be viewed as defamatory.

■ The fourth statement reads:

**But soon after moving in, the writer says, she [Ms. Harris] demanded 40 percent of the book's profits. When he refused, she spread word around Pittsburgh that the well-known Casey—a married father of three—was making sexual demands of her.**

Although Harris admits that she wanted 40 percent of the profits, she insists that she requested, not "demanded," that amount. Her entire argument hinges on a verb choice that does not rise to the level of actionable defamation.

---

1. The Court stated this rule generally, but noted that it would, like the Court in *Hepps,* reserve judgment on cases involving nonmedia defendants. *Milkovich,* 497 U.S. at 20 n. 6, 110 S.Ct. at 2706 n. 6.

■ Harris also contests the truth of the second half of the statement, which says that she was spreading the word around Pittsburgh that Casey had made sexual demands on her. The evidence demonstrates that the statement is substantially true, although it is somewhat exaggerated. Harris, it appears, did "spread the word" to Casey's wife, her landlord, and Pittsburgh restaurant owner Bob Pessalano. In addition, Harris admits that she left messages threatening Casey that she would tell his wife and friends that he made sexual demands of her unless he paid her money. Specifically, in the third recorded telephone message, Harris threatened "I'll have to tell your friends and your wife." In two other messages Harris declared that she called Mrs. Casey.[2] In light of the evidence, the statement is not actionable as defamatory.

The fifth statement reads:

> Then, in August, the owner of a restaurant where Casey is a regular customer told him about a new waitress. "Oh," said Casey, "where is she?" The writer looked down the bar and saw Harris, who knew her biographer frequented the eatery. "She was standing there, polishing a knife with a cloth and looking hate at me," he recalls. "I thought, 'this is nuts.' I actually fell into a booth. My knees got weak."

■ The record indicates that parts of this statement are undisputedly true. Harris did work for no more than two days at Bob Pessalano's restaurant, where Casey frequently dined—a fact of which Harris was aware. Furthermore, Harris concedes she was angry with Casey, when he came to the restaurant while she was working he was at the end of the bar, and their eyes did meet.

The rest of the statement is Casey's subjective impression. Because it is not possible to prove its falsity, it cannot support a claim of defamation.

■ The sixth allegedly defamatory statement barely mentions Harris, and in no way harms her reputation:

> Finally, in October, Harris left town and Casey finished writing the 350–page opus. The book, *For Love Or Money?,* is expected to include transcripts of secret tape recordings of phone conversations between Kritzik and several prominent Milwaukeeans. Casey says the tapes include "possibly incriminating evidence" against the local notables. At press time, four publishers were about to bid on the book.

The only mention of Harris in this statement is that she left town—a fact she does not dispute. Even if the statement were inaccurate as to precisely when she left Pittsburgh, it still would not be defamatory because it carries no negative connotation. And although the defendants concede that there is a factual error in the statement, that error favors the plaintiff.[3]

■ The seventh and final statement Harris complains of quotes Casey:

> Of Harris, he says: "She's a victim of society and a victim of herself.... She can be one of the nicest people on earth and she can suddenly transform into one of the worst. I think Lynnette Harris is the sum total of what men do to beautiful women in our society, and she allowed it to happen because it was her way of dealing with the world."

---

2. The transcribed text of those messages reads as follows:

**Message 4**
   Hi Babykins. This is Lynnette. I called your wife tonight. She sounds like all of about sixteen. I think you're really a fucking pervert. But anyway, I've already covered my ass. You really should have learned how to deal with cons—yes, I'm not blackmailing you. I'm only telling you that you shouldn't get into white slavery. And you should not try to put on the act that you can't get your dick hard and take advantage of women who have been

in prison for eight months and get them drunk. I'll call your wife again.

**Message 5**
   (Laughter) You're gonna be out a whole lot longer than you realize—ah, Dennis! I called your wife. She sounds awful young—I mean are you into young girls or what? I think you should call me. (Laughter)

3. The secret tape recordings expected to be in the book were apparently made by Harris, not Kritzik, of conversations she had with so-called "prominent Milwaukeeans."

Like statement 5, this is Casey's subjective impression. Although, as I noted, opinions are not entitled to special first amendment protection, the statement is not sufficiently factual to be susceptible of being proved true or false. It cannot be reasonably interpreted as stating actual facts about Harris, and is therefore not actionable as defamatory.

None of the seven statements are actionable in this defamation action. Casey has met his burden, and he is entitled to judgment as a matter of law. Accordingly, Casey's motion for summary judgment is GRANTED and the action against him is DISMISSED.

For all of these reasons, the defendants' motions for summary judgment are GRANTED, and this case is DISMISSED.

SO ORDERED.

ATTACHMENT

# *the* Insider

Dave Schlabowske

**RUNAWAY TWIN**
*Lynnette Harris takes her biographer on a frightening journey.*

hen he began his book on the "*Playboy* twins" and their relationship with the late multimillionaire David Kritzik, Dennis M. Casey found Lynnette Harris to be charming and "seemingly forthright." But by the end, says Casey, a Pittsburgh writer and television political analyst, Harris transformed from a cooperative source into a frightening extortionist.

*Playboy* models Harris and her twin sister, Leigh Ann Conley, were convicted in federal court in 1990 of failing to pay taxes on millions of dollars from Kritzik. A federal appeals court overturned the verdict last year, accepting the twins' argument that money from the octogenarian was a gift and thus not taxable.

Casey was tipped off to the story by a friend who knew he was interested in tax law. After originally rejecting the idea as "seamy," he followed up when he heard on TV that Harris was imprisoned in West Virginia, just a short drive from his home.

"I was going to stay at the prison for just three hours, but the more she talked the more interested I became," he says. Soon he was poring over microfilm of newspaper coverage of the case. "My first thought was, 'This thing stinks.... Why would the government pursue this so zealously?' "

After spending thousands of dollars on long-distance phone calls and seeing the project grow from an article into a book, Casey decided last summer to rent a $700-a-month apartment for Harris in the Pittsburgh area so she'd be nearby for interviews. But soon after moving in, the writer says, she demanded 40 percent of the book's profits. When he refused, she spread word around Pittsburgh that the well-known Casey — a married father of three — was making sexual demands of her.

Casey realized that he may have placed himself "in a degree of peril here because the interviews had been done alone." He'd already warned his wife about Harris when on July 24, he says, the twin called: "This is one of Dennis' many girlfriends," she told Casey's wife, who hung up.

Casey went to the police and filed "an informational complaint" as protection during the months Harris remained at the prepaid apartment. "I was concerned she would repeat the behavior she exhibited with [ex-boyfriend] Al Hoffman, where she charged him with rape. I have a reputation to keep here."

**Fatal attraction?: Lynnette Harris.**

Then, in August, the owner of a restaurant where Casey is a regular customer told him about a new waitress. "Oh," said Casey, "where is she?" The writer looked down the bar and saw Harris, who knew her biographer frequented the eatery. "She was standing there, polishing a knife with a cloth and looking hate at me," he recalls. "I thought, 'This is nuts.' I actually fell into a booth. My knees got weak."

Hours later, Casey received a phone call from a gruff-sounding man: "This is Joey Palermo and I want you to do yourself a favor — leave Lynnette alone. You leave her the f— alone." Again, Casey told police.

"I began to go to church every day. I was scared to death," says Casey. "I thought, 'My God, this has gone crazy.' " As a precaution, he installed spotlights around his house.

He was tempted to drop the book — "This story was emotionally draining" — but he'd invested 2,200 hours and had done more than 200 interviews. Finally, in October, Harris left town and Casey finished writing the 350-page opus. The book, *For Love or Money?*, is expected to include transcripts of secret tape recordings of phone conversations between Kritzik and several prominent Milwaukeeans. Casey says the tapes include "possibly incriminating evidence" against the local notables. At press time, four publishers were about to bid on the book.

What's Casey's final take on the story? Of Kritzik, he says: "He was a man of excess in terms of women" who, according to some who knew him, may have "expended nearly $20 million on women" over 30 years.

Of Harris, he says: "She's a victim of society and a victim of herself.... She can be one of the nicest people on earth and she can suddenly transform into one of the worst. I think Lynnette Harris is the sum total of what men do to beautiful women in our society, and she allowed it to happen because it was her way of dealing with the world."

*— James Romenesko*