**Ralph UNDERWAGER and Hollida Wakefield, Plaintiffs–Appellants,**

v.

**Anna SALTER, et al., Defendants–Appellees.**

No. 93–2422.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 10, 1993.

Decided April 25, 1994.

Robert Sutton (argued), Milwaukee, WI, for Ralph Underwager and Hollida Wakefield.

John W. Markson (argued), John M. Moore, Teresa A. Mueller, Bell, Metzner, Gierhart & Moore, Madison, WI, for Anna Salter.

Michael L. Zaleski (argued), Andra J. Palmer, Quarles & Brady, Madison, WI, for Patricia Toth, Mimi Rose, National Center for Prosecution of Child Abuse, American Prosecutors Research Institute and National Dist. Attys., Ass'n and James Peters, Sr.

Michael P. Erhard, Foley & Lardner, Milwaukee, WI, Grant C. Mitchell, Vaughan & Vaughan, Lafayette, IN, for Charles Vaughn.

Charles Vaughn, pro se.

Before EASTERBROOK and ROVNER, Circuit Judges, and REINHARD, District Judge.[*]

EASTERBROOK, Circuit Judge.

Psychologists Ralph Underwager and Hollida Wakefield have written two books: *Accusations of Child Sexual Abuse* (1988), and *The Real World of Child Interrogations* (1990). They conclude that most accusations of child sexual abuse stem from memories implanted by faulty clinical techniques rather than from sexual contact between children and adults. The books have not been well received in the medical and scientific press. A review of the first in the *Journal of the American Medical Association* concludes that the authors took a one-sided approach: "it may be that the adversarial system has so influenced this discussion [about child abuse] that objectivity no longer has value. The book contains almost 420 text pages and the authors cite over 700 references, but they do not really review this body of literature, they cross-examine it. When a given reference fails to support their viewpoint they simply misstate the conclusion. When they cannot use a quotation out of context from an article, they make unsupported statements, some of which are palpably untrue and others simply unprovable." David L. Chadwick, Book Review, in 261 JAMA 3035 (May 26, 1989).

---

[*] Hon. Philip G. Reinhard, of the Northern District of Illinois, sitting by designation.

Underwager's approach has failed to carry the medical profession, but it has endeared him to defense lawyers. He has testified for the defendant in more than 200 child abuse prosecutions and consulted in many others. When prosecutors in Australia concluded that Tony Deren had sexually assaulted children who attended his wife's nursery school, Deren's lawyers hired Underwager, who testified at a preliminary hearing that children are incapable of correctly remembering or accurately describing sexual contacts. The judge accepted this view, which Underwager depicted as the medical consensus, and Deren was not committed for trial. That decision caused a public outcry in Australia, and "60 Minutes Australia," modeled after the CBS series in the United States, decided to look into the subject. Reporter Mike Munro interviewed Underwager at his clinic in Minnesota and traveled to New York to interview other persons, including Anna Salter, a psychologist who had written a monograph about Underwager's conclusions. The program, "Witness for Mr Bubbles" (Deren allegedly assaulted the children in the nursery's whirlpool bath and came to be called "Mr Bubbles" in the Australian press), aired in Australia on August 5, 1990. The producers sent a tape of the episode to Salter, who sent a copy to Patricia Toth. Since 1987 Toth, formerly a criminal prosecutor in Washington state, has been the director of the National Center for Prosecution of Child Abuse, a project of the American Prosecutors Research Institute.

Salter had for some years doubted that Underwager's books and testimony accurately reflected the clinical literature. After receiving a grant from the New England Association of Child Welfare Commissioners and Directors to finance an annotated bibliography of studies on child abuse interviews, Salter decided to concentrate on the papers Underwager and Wakefield had cited in their 1988 book. Over the course of 18 months Salter read the original works Underwager and Wakefield had discussed. In January 1990 she delivered to the New England Association a monograph titled: "Accuracy of Expert Testimony in Child Sexual Abuse Cases: A Case Study of Ralph Underwager and Hollida Wakefield." This unpublished monograph has been widely circulated; Salter sent a copy to the National Center for Prosecution of Child Abuse, which has made it available to prosecutors and other interested persons. The monograph is highly critical of the 1988 book and of Underwager's testimony. Like Dr. Chadwick's book review, the monograph states that the book misrepresents the studies, rips quotations from their context (and misleadingly redacts them), attributes to scholars positions they once held but have repudiated in light of more recent research, and ignores evidence contradicting its thesis. While Chadwick's indictment of the book advances conclusions but not the supporting evidence, Salter's is packed with details. For her interview with 60 Minutes Australia, however, Salter compressed her conclusions into popular language, telling Munro that Underwager "distorts the facts" and that his testimony in the Mr Bubbles case that 90% of all accusations of child molestation are wrong is "gobbledygook" unsupported by any scientific evidence. In October 1990 Toth made a two-hour presentation to prosecutors at the Midwest Conference on Child Sexual Abuse and Incest, held in Madison, Wisconsin. As part of her presentation Toth played the Mr Bubbles episode. She has since played the tape at 10 or more other workshops.

Underwager and Wakefield believe that they have been defamed. They filed this action under the diversity jurisdiction in the Western District of Wisconsin, using the playing of the Mr Bubbles tape at the Midwest Conference as the actionable event. They named 11 defendants: Salter, Toth, Munro, the National Center for Prosecution of Child Abuse, the American Prosecutors Research Institute, the National District Attorneys Association, Channel 9 Australia, 60 Minutes of Australia, Mimi Rose, Charles Vaughan, and James Peters. The district judge quickly dismissed the National Center for Prosecution of Child Abuse; as a "project" of the American Prosecutors Research Institute it is not a juridical entity and cannot be sued. Channel 9 Australia and 60 Minutes of Australia also appear to be trade names rather than legal entities, but we need not worry about them because they (and

Munro) have been dropped from the litigation by consent. Rose, Vaughan, and Peters were among the persons Munro interviewed for the *Mr Bubbles* segment. The district judge dismissed them because they have no contacts with Wisconsin. None of them did anything in Wisconsin, sent anything into Wisconsin, or had any way of knowing that a segment of an Australian TV series would end up being shown at a seminar in Wisconsin. The judge granted summary judgment in favor of the American Prosecutors Research Institute and the National District Attorneys Association because they had nothing to do with the defamation of which plaintiffs complain. These rulings are correct and do not require additional comment. Similarly we step lightly past the question, discussed in detail at oral argument, whether the papers in the district court show complete diversity of citizenship. Additional documents filed after oral argument establish jurisdiction. 28 U.S.C. § 1653.

■ Only Salter and Toth remained as defendants. The district court granted summary judgment in their favor, concluding that no evidence in the record suggests that they acted with "actual malice"—a term that reads to the untutored eye as a proxy for "ill will" but actually means knowledge that the statement was false, or doubts about its truth coupled with reckless disregard of whether it was false. *Masson v. New Yorker Magazine, Inc.,* 501 U.S. 496, ——–——, 111 S.Ct. 2419, 2429–30, 115 L.Ed.2d 447 (1991). See also *Harte–Hanks Communications, Inc. v. Connaughton,* 491 U.S. 657, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *St. Amant v. Thompson,* 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968); *Chang v. Michiana Telecasting Corp.,* 900 F.2d 1085, 1088 (7th Cir.1990). The district judge assumed that Salter and Toth hold Underwager in low esteem and would be delighted to see his career as an expert witness in tatters, but the judge held that the undisputed evidence shows that Salter believes that all of her statements are true, that Toth believes that the statements in the *Mr Bubbles* tape are true, and that neither person acted recklessly in reaching these conclusions. Salter and Toth add, in

defense of their judgment, that the undisputed facts show that the statements are actually true, making their states of mind (and the care that preceded their statements) irrelevant. Like the district court we shall assume that at least some of the statements are untrue and defamatory. Cf. *Moldea v. New York Times Co.,* 15 F.3d 1137 (D.C.Cir.1994). Affidavits offered in opposition to the motion for summary judgment create a material dispute on the truth of the statements. Like the district court, however, we believe that there is no bona fide dispute about actual malice.

■ Before discussing that issue in detail, however, we take up plaintiffs' argument that they need not establish actual malice—either because they are not public figures or because Wisconsin law reserves the actual malice standard for the press. Note that we speak of Wisconsin law, not of the complex of rules under the first amendment that has been developing since *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). Constitutional defenses are irrelevant unless state law creates liability. Federal courts decide constitutional questions only when necessary. So the first, and as it turns out the last, subject is whether Wisconsin would require Salter and Toth to pay damages. (The parties agree that Wisconsin law applies.) Like other states, Wisconsin recognizes many defenses to claims of defamation. Some of these have come under the influence of constitutional doctrine in the wake of *New York Times* but remain questions of state law; others have been rooted in the common law from the outset. For example, there is a privilege for statements among persons sharing a common interest—as prosecutors share an interest in knowing about defense strategies in child molestation cases. See *Zinda v. Louisiana Pacific Corp.,* 149 Wis.2d 913, 440 N.W.2d 548 (1989); *Restatement (2d) of Torts* § 596 (1976). Salter and Toth published their statements to persons sharing a common interest, but the privilege is conditional and lost if abused. Knowledge that the statement is false would constitute abuse, *Ranous v. Hughes,* 30 Wis.2d 452, 468, 141 N.W.2d

251, 259 (1966), so state law requires us to examine that issue.

■ According to plaintiffs, this is inappropriate because they are not public figures. Although we doubt the significance of this issue to the privilege outlined in § 596 of the *Restatement*, it is potentially important because we do not know the composition of the audience for the works. Have the monograph and tape circulated beyond criminal prosecutors? What the record reveals about the plaintiffs, however, establishes that they are limited-purpose public figures. They have published two books on a subject of great public interest. Underwager has testified in numerous cases and addressed more than 30 conferences on the subject of child sexual abuse. He has appeared on many television programs, including the "Phil Donahue Show," the "Today Show," and "Geraldo," and agreed to be interviewed for the *Mr Bubbles* segment—although he changed his mind after concluding that Munro was not a friendly interviewer, and the tape depicts him shooing the camera crew out of his office and calling Munro a "bastard." Underwager served on the board of the False Memory Syndrome Foundation until resigning after being quoted as telling a Dutch journal that sex with children is a "responsible choice for the individual." Stephen Fried, *War of Remembrance*, Philadelphia 66, 71 (Jan.1994). Wakefield still is a member of that organization's board. Wisconsin treats as a limited-purpose public figure a person whose "role in the controversy" explored by the defendant's speech "is more than trivial or tangential". *Van Straten v. Milwaukee Journal*, 151 Wis.2d 905, 913, 447 N.W.2d 105, 109 (Wis. App.1989). Both Underwager and Wakefield are "more than trivial or tangential" figures in the public controversy about child abuse, striding into that arena by choice. That a man-on-the-street survey in Madison, Wisconsin, reveals that almost none of the pedestrians could identify Underwager or Wakefield shows little; few people can name the Chief Justice of the United States. Underwager and Wakefield are well-known personages in the legal, medical, and scientific debates about children's ability to describe their sexual experiences; that is quite enough to lead Wisconsin to apply its public

figure rules to an analysis of statements about this subject.

■ Even so, plaintiffs insist, they need not establish actual malice because neither Salter nor Toth is a reporter or the publisher of a newspaper. Twelve years ago the Supreme Court of Wisconsin observed that the Supreme Court of the United States "has not ruled as to whether the standards governing defamation actions set forth in *Gertz* [*v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974)] apply to all defendants, or just media defendants." *Denny v. Mertz*, 106 Wis.2d 636, 660, 318 N.W.2d 141, 152 (1982). There is still doubt whether the Constitution applies the same standards to media and private defendants. *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 779 n. 4, 106 S.Ct. 1558, 1565 n. 4, 89 L.Ed.2d 783 (1986); *Hutchinson v. Proxmire*, 443 U.S. 111, 133 n. 16, 99 S.Ct. 2675, 2687 n. 16, 61 L.Ed.2d 411 (1979). How the Supreme Court understands the first amendment is, however, neither here nor there. We have been exploring how Wisconsin understands its own law. *Denny* held that one private person's defamation of another private person should be adjudicated according to the common law, without any special burden on the plaintiff. 106 Wis.2d at 661, 318 N.W.2d at 153. We have concluded, however, that Underwager and Wakefield are not private persons; when talk turns to child abuse, they are public figures. Cases since *Denny* have made it clear that a public figure must establish that the defendant acted with actual malice. *Van Straten*, the most recent in this line, collects earlier decisions. None of the cases we could find suggests that Wisconsin imposes a lesser burden on a public figure suing a psychologist or prosecutor than on one suing a reporter.

Actually, we could not find cases either way on this subject; all of Wisconsin's "public figure" cases were against media defendants. Plaintiffs therefore need to persuade us that Wisconsin would establish such a distinction for purposes of its domestic law. Yet they offer no reasons to suppose the state would do so. Just as the public has a strong interest in providing reporters with a

qualified privilege to report on current events without fear of liability for accidental misstatements, so the public has a strong interest in protecting scholars and prosecutors. We do not disparage the countervailing private interest in reputation; that is why even the *New York Times* privilege is qualified rather than absolute. The private interest at stake is not greater when the defendant is a psychologist rather than a reporter; the limited circulation of an unpublished monograph implies that any distinction would run the other way. And the private need for the privilege may well be greater in the case of scholars and prosecutors than in the case of newspapers and broadcasters. Newspapers, magazines, and broadcast stations reap considerable profits from their endeavors, and the obligation to pay damages to those they injure is unlikely to put them out of business or even substantially temper their reports. (Consider that the British press, which lacks the *New York Times* shield, is today at least as likely as the American press to publish adverse information about public figures.) Psychologists compiling monographs with the aid of research grants, and prosecutors seeking to augment one side's arsenal for trial, do not receive comparable rewards. Exposing such persons to large awards of damages is more apt to lead to silence than are comparable awards against media defendants.

What, then, does the record show about actual malice? Did Salter or Toth know that the statements were false? Did either one harbor doubts about the statements' truth yet plunge recklessly ahead? The record allows no doubt about the answer to either question, for either defendant.

Salter testified by deposition that she read every one of the more than 500 papers her monograph discusses, and that she believes that her interpretation of these studies (and her condemnation of the Underwager and Wakefield interpretation) is correct. Salter's view of the scholarly literature is congruent with Dr. Chadwick's, and all of the other reviews we could find take Salter's side rather than plaintiffs'. Sandra Shrimpton, Book Review (of *Accusations* ...), 14 Child Abuse & Neglect 601–02 (1990); David L. Chad-

wick, Book Review (of *Real World* ...), 15 Child Abuse & Neglect 602–03 (1991); Lenore Olson, Book Review (of *Real World* ...), 37 Social Work 276 (1992); John E.B. Myers, *The Child Sexual Abuse Literature: A Call for Greater Objectivity*, 88 Mich. L.Rev. 1709, 1711–17 (1990) (discussing *Accusations* ... and two books by other authors). Some judges have reached a similar conclusion. For example, the Supreme Court of Washington held that Underwager's analysis and conclusions are not accepted by the scientific community, making it appropriate for a trial judge to preclude him from testifying. *State v. Swan*, 114 Wash.2d 613, 655–56, 790 P.2d 610, 632 (1990). See also *Timmons v. Indiana*, 584 N.E.2d 1108 (Ind. 1992) (sustaining a decision to limit Underwager's testimony severely). Cf. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, —— U.S. ——, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). It may be that Salter, the judges, and the book reviewers all err in evaluating the Underwager–Wakefield work. Scientific truth is elusive. Nothing in this record suggests, however, that Salter either knew that she was writing falsehoods or feared that she might be doing so but barged ahead without checking.

Toth filed an affidavit describing what she did before playing the *Mr Bubbles* tape. Instead of accepting at face value what reporter Munro and the persons he interviewed had said, Toth read the transcript of the *Deren* hearing, all of the cases to which any of the persons on the tape referred, and a scientific report on the subject. She concluded that the allegations made against Underwager are true, and only then did she play the tape as part of her presentation. Underwager does not offer any contrary evidence about Toth's investigation and conclusions. (Only Underwager sued Toth; the *Mr Bubbles* tape does not mention Wakefield.)

In lieu of evidence about defendants' investigation and state of mind concerning the truth of their statements, plaintiffs offer the fact that both Salter and Toth have continued publishing the defamatory statements. Salter's monograph remains in circulation, and she continues to pass out copies of the *Mr Bubbles* tape. Toth frequently lectures on the subject of child molestation, and she con-

tinues to use the *Mr Bubbles* tape as part of her presentation. Surely this establishes their malice, plaintiffs insist. Repeated publication is the principal reason Underwager and Wakefield offer in support of their claim that Salter and Toth acted with actual malice. The only other evidence is a statement by Wendy Walker, an Australian psychologist, who testified by deposition that the "facial expression, content of speech and body language" of the persons interviewed by 60 Minutes Australia implied that these persons are "strongly negative towards Dr Underwager."

Reliance on these facts shows only that plaintiffs' counsel have been taken in by the lay connotations of "actual malice." We observed at the outset that "actual malice" has nothing in common with "ill will." A person who concludes that a public figure is a knave may shout that conclusion from the mountain tops. Both Salter and Toth came to believe that Underwager is a hired gun who makes a living by deceiving judges about the state of medical knowledge and thus assisting child molesters to evade punishment. Persons who hold such opinions cannot be expected to look kindly on their subjects, and the law certainly does not insist that they shut up as soon as they are challenged. *Van Straten*, 151 Wis.2d at 917–18, 447 N.W.2d at 110–11 (repeated publication did not establish actual malice when the speakers believed their statements to be true). Underwager and Wakefield cannot, simply by filing suit and crying "character assassination!", silence those who hold divergent views, no matter how adverse those views may be to plaintiffs' interests. Scientific controversies must be settled by the methods of science rather than by the methods of litigation. Cf. *Buckley v. Fitzsimmons*, 20 F.3d 789, 796–97 (7th Cir. 1994). More papers, more discussion, better data, and more satisfactory models—not larger awards of damages—mark the path toward superior understanding of the world around us.

AFFIRMED.