**Lynette HARRIS, Plaintiff–Appellant,**

v.

**Betty Ewens QUADRACCI, James Romenesko, Dennis M. Casey, Quad/Creative, Incorporated, and David A. Fryxell, Defendants–Appellees.**

No. 94–2834.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 2, 1994.

Decided Feb. 15, 1995.

Robert Sutton, Milwaukee, WI (argued), for Lynette Harris.

Brady C. Williamson (argued), Robert Dreps, Lafollette & Sinykin, Madison, WI, for Betty Ewens Quadracci, James Romenesko and Quad/Creative, Inc.

Terry E. Mitchell, Mitchell, Baxter, O'Meara & Mathie, Milwaukee, WI, Charles F. Scarlata, Pittsburgh, PA, for Dennis M. Casey.

Before CUMMINGS, BRIGHT,* and PELL, Circuit Judges.

BRIGHT, Circuit Judge.

## I. Introduction

In this defamation action, Lynette Harris sought damages from James Romenesko, Dennis M. Casey, Betty Ewens Quadracci and Quad/Creative, Inc. for statements made in a *Milwaukee Magazine* article, entitled "Runaway Twin: Lynette Harris takes her biographer on a frightening journey." The district court [1] granted summary judgment, dismissing Harris' defamation claim. Harris appeals.

Harris raises three issues on appeal: (1) the district court erred in concluding that as a matter of law she was a limited purpose public figure under the *New York Times* "actual malice" standard; (2) even assuming the district court had properly characterized

Harris as a "public figure," it erred in finding no genuine issue of "actual malice"; and (3) the district court misapplied Wisconsin defamation law in holding her claims against Dennis Casey to be nonactionable. We affirm.

## II. Background

In 1990, a jury in federal district court convicted Lynette Harris of income tax evasion. Harris had failed to report as income thousands of dollars received from David Kritzik, a wealthy widower, now deceased, who was partial to the company of young women. The court sentenced Harris to ten months in prison.

In 1991, this court reversed Harris' conviction and ordered that the indictment against Harris be dismissed. The court observed that based on current law the payments such as those made to Harris may qualify either as a gift, taxable under gift tax law to the donor, or as income, taxable to the recipient. As a result of this uncertainty, Harris had no fair warning that her conduct was criminal. *See United States v. Harris*, 942 F.2d 1125 (7th Cir.1991).

Harris' trial generated a considerable amount of publicity in the Milwaukee area, and to some extent nationally. Prior to her indictment, Harris had become, in her own words, "pretty well-known" in Milwaukee as a model and actress. She had appeared in several Milwaukee newspaper advertisements, on local television, and in *Playboy* magazine on four different occasions. After her indictment and as the trial approached, Harris' media exposure increased. She began granting numerous interviews and appeared on several nationally-syndicated television shows, including "Larry King Live," "Oprah Winfrey," "Inside Edition" and "Entertainment Tonight."

After her conviction and during the pendency of her appeal, Harris was imprisoned in West Virginia. There she met Dennis Casey, a Pittsburgh journalist. Casey befriended Harris and offered to write a book

---

* The Honorable Myron H. Bright, Circuit Judge for the United States Court of Appeals for the Eighth Circuit, is sitting by designation.

1. The Honorable Terence T. Evans, Chief Judge for the United States District Court for the Eastern District of Wisconsin.

about her and her twin sister, Leigh Ann Conley. Ms. Conley was separately prosecuted and convicted for the same crimes for which Ms. Harris was prosecuted and convicted. This court reversed her conviction as well.

When this court overturned Harris' conviction, she relocated to Pittsburgh and moved into an apartment rented for her by Casey. During the ensuing months, as Casey purportedly worked on a book about Harris,[2] his relationship with Harris soured. Although very sketchy, the record suggests that because Harris wanted a percentage of the proposed book's expected profits and Casey refused, Harris told several individuals, including Casey's wife, that Casey had made sexual demands of Harris. Additional evidence suggests that Harris had called Casey on several different occasions, apparently threatening to ruin Casey's reputation if he did not pay her. The parties disagree as to whether Casey had made any sexual demands of Harris and to whether they had had a sexual relationship, but Harris has acknowledged under oath that she made the threatening phone calls and that these calls could be interpreted as extortionary in nature.

In February 1992, *Milwaukee Magazine,* a general circulation magazine published in the Milwaukee area, printed an article entitled "Runaway Twin: Lynette Harris takes her biographer on a frightening journey." The article was penned by James Romenesko, a journalist who had been employed at *Milwaukee Magazine* since 1982. Mr. Romenesko's article begins with background information on the "tax evasion" prosecution of Lynette Harris and her sister, and then proceeds to describe Casey's book idea and, more extensively, his various "experiences" with Harris. Romenesko principally based his article upon several telephone interviews with Casey. Casey had originally contacted Romenesko because Romenesko was familiar with Harris, having already written an article about her in July 1990.

After the "Runaway Twin" article appeared in print, Harris brought this action for defamation against the named defendants, identifying seven passages from the article that Harris contends are false and defamatory. These passages include:

(1) But by the end, says Casey, a Pittsburgh writer and television political analyst, Harris transformed from a cooperative source into a frightening extortionist.

(2) *Playboy* models Harris and her twin sister, Leigh Ann Conley, were convicted in federal court in 1990 of failing to pay taxes on millions of dollars from Kritzik. A federal appeals court overturned the verdict last year, accepting the twins' argument that money from the octogenarian was a gift and thus not taxable.

(3) Casey was tipped off to the story by a friend who knew he was interested in tax law.

(4) But soon after moving in, the writer says, she [Ms. Harris] demanded 40 percent of the book's profits. When he refused, she spread word around Pittsburgh that the well-known Casey—a married father of three—was making sexual demands of her.

(5) Then, in August, the owner of a restaurant where Casey is a regular customer told him about a new waitress. "Oh," said Casey, "where is she?" The writer looked down the bar and saw Harris, who knew her biographer frequented the eatery. "She was standing there, polishing a knife with a cloth and looking hate at me," he recalls. "I thought, 'This is nuts.' I actually fell into a booth. My knees got weak."

(6) Finally, in October, Harris left town and Casey finished writing the 350–page opus. The book, *For Love or Money?,* is expected to include transcripts of secret tape recordings of phone conversations between Kritzik and several prominent Milwaukeeans. Casey says the tapes include "possibly incriminating evidence" against the local notables. At press time, four publishers were about to bid on the book.

2. Ms. Harris claims that Casey misled her and has not written any material for publication as a book.

(7) Of Harris, he says: "She's a victim of society and a victim of herself. . . . She can be one of the nicest people on earth and she can suddenly transform into one of the worst. I think Lynnette [sic] Harris is the sum total of what men do to beautiful women in our society, and she allowed it to happen because it was her way of dealing with the world."

The district court granted the defendants' summary judgment motion, holding, as a matter of law, that Lynette Harris could satisfy neither the common law nor constitutional elements of her defamation claim. *Harris v. Quadracci,* 856 F.Supp. 513 (E.D.Wis.1994) (order). This appeal followed.

### III. Discussion

#### A. Media Defendants: James Romenesko, Betty Ewens Quadracci and Quad/Creative, Inc.

##### 1. Limited Purpose Public Figure

█ Harris' principal contention on appeal is that the district court erroneously characterized her as a "limited purpose public figure" with respect to the *Milwaukee Magazine* article at issue here. Because the district court established that Harris had "public figure" status, the court required Harris to prove by clear and convincing evidence that James Romenesko, Betty Ewens Quadracci and Quad/Creative, Inc. evidenced "actual malice" in making and publishing defamatory falsehoods. Harris claims that she is a private figure and under Wisconsin law should only have to prove the defendants acted negligently.[3]

In *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), the Supreme Court for the first time established constitutional limitations on a state's power to award damages in a libel action brought by a public official against critics of his official conduct. The restrictions imposed prohibited "a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he [could] prove[ ] that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *Id.* at 279–80, 84 S.Ct. at 726.

In subsequent cases, the Supreme Court extended its application of the "actual malice" standard to "public figures," not merely "public officials." *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967); *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). According to the Court in *Gertz,* "[a]bsent clear evidence of general fame or notoriety in the community, and pervasive involvement in the affairs of society, an individual should not be deemed a public personality for all aspects of his life." *Id.* at 352, 94 S.Ct. at 3013. On the other hand, "an individual [who] voluntarily injects himself or is drawn into a particular public controversy . . . becomes a public figure for a limited range of issues." *Id.* at 351, 94 S.Ct. at 3013. Accordingly, the Court had delimited two types of "public figures": persons who are public figures for all purposes and those who are public figures for particular public controversies. For purposes of this appeal, however, we are principally concerned with the relevant characteristics of a limited purpose public figure.[4]

Although the Supreme Court has not set forth the pertinent criteria for determining who is a limited purpose public figure, Wisconsin courts have.[5]

---

3. Specifically, Harris would need to prove that the magazine acted negligently, as defined by Wisconsin law, *see Denny v. Mertz,* 106 Wis.2d 636, 318 N.W.2d 141, 151, *cert. denied,* 459 U.S. 883, 103 S.Ct. 179, 74 L.Ed.2d 147 (1982), and would also need to establish that the statements at issue were false, *see Philadelphia Newspapers, Inc. v. Hepps,* 475 U.S. 767, 768–69, 106 S.Ct. 1558, 1559–60, 89 L.Ed.2d 783 (1986).

4. The district court ruled that there was "not quite enough" evidence to support characterizing Ms. Harris as a public figure for all purposes. As a result, we need not address this issue here.

5. Whether a plaintiff is a "public figure" or simply a private person is a question of federal constitutional law and Supreme Court rulings are controlling. Nevertheless, because the Supreme Court has not defined the precise contours of who constitutes a "public figure" and because states are entitled to provide a broader, though no more constricted, meaning to "public figures," resort to Wisconsin case law is appropri-

In *Van Straten v. Milwaukee Journal Newspaper–Publisher*, 151 Wis.2d 905, 447 N.W.2d 105, *review denied*, 451 N.W.2d 297 (Wis.1989), *cert. denied*, 496 U.S. 929, 110 S.Ct. 2626, 110 L.Ed.2d 646 (1990), the Wisconsin Court of Appeals presented several alternative tests for determining whether a defamation plaintiff may be considered a limited purpose public figure. The court ultimately settled upon what it characterized as the "federal analysis," discussed in more detail in one of its earlier opinions, *Wiegel v. Capital Times Co.*, 145 Wis.2d 71, 426 N.W.2d 43, 49 (App.), *review denied*, 144 Wis.2d 957, 428 N.W.2d 554 (1988). Under the "federal analysis," denominated as such because of its reliance on *Waldbaum v. Fairchild Publications, Inc.*, 627 F.2d 1287, 1296–98 (D.C.Cir.), *cert. denied*, 449 U.S. 898, 101 S.Ct. 266, 66 L.Ed.2d 128 (1980), the court applies a three-part inquiry:

> (1) isolating the controversy at issue [and determining whether it was a controversy of substantial statewide public interest affecting persons beyond the immediate participants in dispute]; (2) examining the plaintiff's role in the controversy to be sure that it is more than trivial or tangential; and (3) determining if the alleged defamation was germane to the plaintiff's participation in the controversy.

*Van Straten*, 447 N.W.2d at 109. Unlike the analysis detailed in an earlier Wisconsin Supreme Court opinion, *Denny v. Mertz*, 106 Wis.2d 636, 318 N.W.2d 141, 147, *cert. denied*, 459 U.S. 883, 103 S.Ct. 179, 74 L.Ed.2d 147 (1982), the "federal analysis" deempha-

sizes the voluntariness of the plaintiff's involvement in the controversy and focuses on the plaintiff's role. The analysis retains, however, *Denny's* underlying presumption that a "public figure" plaintiff is usually one whose status ensures easy access to the media so as to rebut defamatory statements. *Van Straten*, 447 N.W.2d at 108, 110; *Wiegel*, 426 N.W.2d at 51; *Denny*, 318 N.W.2d at 145, 147 n. 17, 148.[6]

On appeal, Harris exclusively attacks part three of the "federal analysis," thus implicitly accepting the district court's conclusion that (1) "the controversy surrounding [Harris was] somewhat broad" and (2) that "Harris' role in the controversy as the defendant is clearly more than tangential or trivial." *Harris*, 856 F.Supp. at 518. As for the third prong of the analysis, Harris contends that the alleged defamatory article was not "germane" to the 1990 tax controversy, but instead related exclusively to her relationship with Dennis Casey for a period of time after her release from prison.

The district court disagreed, reasoning as follows:

> Ms. Harris acknowledges that she worked with Casey on the book because she hoped it would present her side of the controversy. Romenesko's article is about Harris and the circumstances surrounding her participation in helping Casey write the book. It is germane to her role in the controversy.

*Id.*

Our independent review of the summary judgment record, as well as the arguments

---

ate in this diversity action. *See* Restatement (Second) of Torts § 580A cmt. c (1977); *see also Underwager v. Salter*, 22 F.3d 730, 733–34 (7th Cir.) (relying on Wisconsin law in defining the characteristics of a limited purpose public figure), *cert. denied*, —— U.S. ——, 115 S.Ct. 351, 130 L.Ed.2d 306 (1994).

Because determination of the status of the plaintiff in a defamation action is a question of law, *Rosenblatt v. Baer*, 383 U.S. 75, 88, 86 S.Ct. 669, 677, 15 L.Ed.2d 597 (1966), we review de novo the district court's grant of defendants' summary judgment motion.

6. We, however, note that the Wisconsin Court of Appeals, without explanation, recently applied the old *"Denny* test" in determining whether members of the Wauwatosa Police and Fire

Commission were "public figures." *See Benson v. Schmidt*, No. 93–3374, slip op. at 2–3, 1994 WL 678583 (Ct.App. Dec. 6, 1994). As noted, the *"Denny* test" places great emphasis on the voluntariness of the defamation plaintiff's actions, thus limiting the range of plaintiffs covered by the *New York Times* standard. Although the Supreme Court has not definitively picked a standard for defining "public figures," we believe the more broadly defined "federal analysis," as described in *Van Straten* and in *Wiegel*, better comports with the Supreme Court's commentary in *Gertz*, 418 U.S. at 351 (noting that an individual becomes a public figure when he "voluntarily injects himself **or is drawn into a particular public controversy**" (emphasis added)), and better conforms to the state court's restricted role in defining constitutional standards, *see supra* note 5.

252

raised on appeal, supports the district court's decision. First, the article addresses at length Harris' and her sister's 1990 tax evasion conviction and its subsequent reversal by this court. It also delves into Dennis Casey's interest in writing the proposed book, quoting Casey as being suspicious of the government's interest in pursuing the sisters on tax evasion charges.[7] Only after reading a third of the article is one treated to a discussion on the relationship between Harris and Casey. Second, Casey's proposed book is directly linked to the 1990 tax controversy. As appellees succinctly noted in their brief, "without the tax case there would have been no controversy and without the controversy, [there would have been] no book." Appellee's Br. at 13. Third, as suggested by the district court, Harris' interest in the proposed book stemmed from a desire to present her side of the tax case and clear up her image. As already noted, a person's access to the media is a relevant factor in determining their status as a "public figure." *Van Straten*, 447 N.W.2d at 108, 110.

In sum, the article in question was "germane" to the tax controversy. Therefore, given that Harris has acknowledged the applicability of the first two prongs of the "federal analysis" inquiry, we conclude that Harris was, as a matter of law, a limited purpose public figure.

### 2. Actual Malice

Harris next contends that even if she can be characterized as a limited purpose public figure, she had presented sufficient evidence of "actual malice" to survive the defendants' motion for summary judgment.

To survive a summary judgment motion, Harris must have set forth facts that would "permit a reasonable finder of fact, by clear and convincing evidence, to conclude that respondents published a defamatory statement with actual malice as defined by [Supreme Court] cases." *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 508, 111 S.Ct. 2419, 2428, 115 L.Ed.2d 447 (1991); *see also Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 255–56, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202 (1986).

The Supreme Court cases referred to in *Masson* provide that the publication of defamatory statements with knowledge of their falsity or with reckless disregard for their truth constitutes "actual malice". *New York Times*, 376 U.S. at 280, 84 S.Ct. at 726. Knowledge of falsity means that the defendant was actually aware that the contested publication was false. Reckless disregard of the truth or falsity of a publication occurs when the defendant "in fact entertained serious doubts as to [its] truth," *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968), or a "high degree of awareness of [its] probable falsity." *Garrison v. Louisiana*, 379 U.S. 64, 74, 85 S.Ct. 209, 216, 13 L.Ed.2d 125 (1964); *see also Harte–Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 667, 688, 693, 109 S.Ct. 2678, 2685–86, 2696, 2698–99, 105 L.Ed.2d 562 (1989) (reiterating these tests and noting that purposeful avoidance of the truth may constitute "actual malice"); *Van Straten*, 447 N.W.2d at 110 (adopting the federal legal standard of "actual malice").

As further explained by this court:

Probative evidence of recklessness includes a publisher's knowledge of serious factual inconsistencies, as well as his failure to investigate or independently verify disputed or questionable factual assertions. Recklessness may be found, for example, where there are clear reasons to doubt the truthfulness of the informant or the accuracy of his reports or where a story is fabricated by the defendant or is based entirely on an unverified anonymous telephone call. At the same time, proof of failure to investigate, by itself, is not sufficient to establish a publisher's reckless disregard for the truth or falsity of the challenged publication.

*Woods v. Evansville Press Co., Inc.*, 791 F.2d 480, 485 (7th Cir.1986) (citations omitted).

Our review of the record suggests that Harris has failed to submit facts sufficient to satisfy these standards. First, neither Harris' complaint nor her brief on appeal claims

7. Specifically, the article quotes Casey as saying: "My first thought was, 'This thing stinks.... Why would the government pursue this so zealously?'"

that the named defendants published the alleged defamatory material with "actual malice." Second, Harris has presented absolutely no evidence that these defendants actually doubted what Dennis Casey told them about Lynette Harris. *Cf. Van Straten*, 447 N.W.2d at 111 (noting that because there was no evidence that the reporters and editors "actually doubt[ed] the reports they received from [their] sources," the trial court properly concluded that the defamation plaintiff had failed to produce sufficient evidence that would raise the newspapers' conduct to the level of actual malice).

■ Harris offered an affidavit by an "expert" journalist, Dane Claussen, to support her claim. Claussen's affidavit suggests that because Romenesko failed to adequately investigate the veracity of Casey's story, Romenesko thereby acted recklessly and with "actual malice" in publishing the story. Even if true, this evidence alone is insufficient to establish a genuine issue of "actual malice." As the district court properly noted, " 'mere proof of failure to investigate the accuracy of a statement, without more, cannot establish reckless disregard for the truth.' " *Harris*, 856 F.Supp. at 518–19 (quoting *Van Straten*, 447 N.W.2d at 111). Additionally, the defense presented uncontroverted evidence that Romenesko had independently investigated Casey's claims by listening to the taped messages left by Harris on Casey's answering machine. These messages, all seven of them, indicated that Casey's story was substantially true, *see Masson*, 501 U.S. at 516–17, 111 S.Ct. 2419, 2432–33, 115 L.Ed.2d 447 (holding that statements which are "substantially true" cannot be equated with knowledge of falsity), and that Harris was trying to extort money from Casey. During her deposition testimony, Harris actually admitted that her phone messages could reasonably be interpreted as an attempt at extortion.

For these reasons, we conclude that the district court did not err in granting the defendants' motion for summary judgment.

## B. Dennis Casey

■ Dennis Casey is a nonmedia defendant in this matter. As to nonmedia defendants, the Supreme Court has declined to rule on whether the *New York Times* "actual malice" standard applies. Nevertheless, this court has determined that Wisconsin law allows the application of the "actual malice" standard to at least some nonmedia defendants. In *Underwager v. Salter*, 22 F.3d 730 (7th Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 351, 130 L.Ed.2d 306 (1994), this court applied the protections of the *New York Times* malice standard to a psychologist and a prosecutor, two nonmedia defendants named in a defamation action brought by a public figure. *Id.* at 734–36.

Whether the *New York Times* standard would apply to Dennis Casey, who probably is best characterized as a media *source*, need not be decided here.[8] Instead, we hold that the district court correctly reasoned that as to Casey none of the seven allegedly defamatory statements were actionable.

We observe that Harris specifically contests only the district court's decision as to the first allegedly defamatory statement. That statement reads as follows:

> But by the end, says Casey, a Pittsburgh writer and television political analyst, Harris transformed from a cooperative source into a frightening extortionist.

The district court concluded that regardless of its truth or falsity and regardless of its defamatory character, the statement could not be attributed to Casey.

Harris contends on appeal that because the statement characterizes Casey as its author ("says Casey"), it is "most certainly

8. While the discussion in *Underwager* suggests an *extension* of the "actual malice" standard to all nonmedia defendants, *see id.* at 734–35, the Wisconsin Supreme Court has itself *limited* the reach of *New York Times;* albeit under different factual circumstances. *See Denny v. Mertz*, 106 Wis.2d 636, 318 N.W.2d 141, 152–53 (holding that nonmedia defendants will not be accorded the same level of protection under Wisconsin law

as media defendants when the defamation plaintiff is a *private person*, and not a "public figure") (emphasis added), *cert. denied*, 459 U.S. 883, 103 S.Ct. 179, 74 L.Ed.2d 147 (1982). *But cf. id.* at 158 (Abrahamson, J., dissenting) (noting that it is "unclear" from the majority opinion whether "public figure" plaintiffs need to establish "actual malice" when the defendants are not from the media).

attributable to Casey." Appellant's Br. at 7. We disagree. A complete review of the article indicates that when Romenesko attributed a statement to Casey, he used quotation marks. That Romenesko used no quotation marks in this statement strongly suggests that Romenesko was merely drawing his own conclusions. Romenesko actually testified during his deposition that the "frightening extortionist" characterization was his, and that he based that characterization, at least in part, on having independently listened to the telephone messages left by Harris on Casey's answering machine. Harris offers no evidence to contradict Romenesko's testimony.

As to the remaining six statements, Harris questions the authority of the district court to grant summary judgment, as well as the court's methodology of "diagramming and parcing ... discrete sentences of the article and finding them nonactionable one at a time." *Id.* at 8. We determine that these contentions lack merit. The district court carefully analyzed each of the seven claimed defamatory statements, individually and as a group. The court then determined that under Wisconsin law, "none of the statements [were] actionable as defamatory, either because no factual dispute exist[ed] as to truth, there [was] no way to prove falsity, the statement [was] not attributable to Casey, or it [was] incapable of defaming Harris." *Harris,* 856 F.Supp. at 519.

In sum, the district court did not err in granting Dennis Casey's motion for summary judgment.

## IV. Conclusion

Accordingly, we affirm.