George THOMPSON III, Plaintiff,

v.

NATIONAL CATHOLIC REPORTER PUBLISHING COMPANY, Thomas C. Fox, Leslie Wirpsa and Chris Curry, Defendants.

No. 96–C–641.

United States District Court,
E.D. Wisconsin.

April 10, 1998.

Robert E. Sutton, Sutton & McNamara–McGraw, Milwaukee, WI, for Plaintiff.

Robert J. Dreps, Madison, WI, for Defendants.

CLEVERT, District Judge.

Before the court is the defendants' Motion for Summary Judgment (doc. # 28) and Supplemental Motion for Summary Judgment Dismissing Plaintiff's Second Amended Complaint (doc. # 51). For the reasons set forth herein, the motions will be granted.

## FACTUAL BACKGROUND [1]

The plaintiff, George Thompson III, Briggs & Stratton Corporation, John Shie-

---

1. Pursuant to Local Rule 6.05(d), the court has concluded that there is no genuine material issue as to proposed findings of fact to which there was no response. Any factual statements which are disputed and do not have support in the record were disregarded for purposes of this decision. If a disputed fact proposed by the plaintiff is supported by the portion of the record cited, the court accepted the plaintiff's version as true. To the extent the plaintiff's objections to the proposed findings of fact failed to cite specific evidentiary support, the objection was given no weight. The district court need not scour the record to determine whether there exists a genuine issue of fact to preclude summary judgment.

ly, and Thomas Krukowski commenced this diversity action claiming defamation and invasion of privacy after the defendants published an article, editorial and graphics (collectively, the "articles") in the December 1994 issue of the National Catholic Reporter (NCR), captioned "Adios American Dream." Each of the plaintiffs requested dismissal of their claims with the exception of Thompson. The articles in question chronicle layoffs at the Milwaukee plant of Briggs & Stratton Corporation and relocation of the company's facilities. In addition, the articles discuss the moral, economic and social implications of transferring jobs out of a community, both generally and with respect to Briggs & Stratton.

For example, the editorial states:

This week's cover story shows with stunning clarity how corporate decisions hurt ordinary people and what they reveal about decisionmakers who live in either denial or moral blindness.

What makes this week's story on Briggs & Stratton particularly painful is that among the decisionmakers involved—among those seemingly blind to the consequences of their choices—are Catholics educated in Catholic institutions.

Bill Lange, identified in the article as a Briggs worker and union activist, states that he "thinks it is contradictory that many of the executives at Briggs are prominent Milwaukee Catholics who, he believes, have strayed from the social teachings of the church. He says their management strategies disregard tenets outlined, for example, in the U.S. bishops' economic pastoral, a document developed under the leadership of Milwaukee Archbishop Rembert Weakland."

Thompson is not mentioned by name in either the editorial or graphics. However, the article mentions him twice:

Briggs & Stratton refused to grant NCR any interviews to discuss the company strategy; public relations officials would not even make a telephone statement. Spokesman George Thompson III would only remark Nov. 16 that the company had been frustrated in the past in trying to tell its side of the story. He said that reporters only tell the story from the union's side of the dispute and that no one in the company would be available to answer NCR's question.

Thompson is also mentioned after Lange's comments referenced above:

A spokesperson at Briggs & Stratton confirmed that the company's president, John Shiely, is a Catholic and a graduate of Marquette University High School, Notre Dame University and Marquette University law school.

Marquette is the alma mater of other top players in the controversy, including George Thompson III, director of public relations, and Tom Krukowski, a lawyer hired by the firm to help negotiate a settlement. The company refers to Krukowski as a specialist in "win-win" bargaining. Union members deride the choice of Krukowski as a "sick joke". One local newspaper account refers to Krukowski as "a man long demonized in labor circles as a union-buster."

Thompson contends that he was libeled by implication and innuendo. He asserts that when viewed in the context of the article, editorial and graphics, the words "Catholic," "decisionmaker" and "top player" imply that he "made immoral unethical decisions, is blind to the consequences of his decisions, [and] has strayed from the social teachings of the Church."[2] Thompson further argues that he is not a limited purpose public figure, but even if he is, the defendants published the articles with actual malice. Finally, Thompson asserts that the defendants invaded his privacy under Wis. Stat. § 895.50(2)(c).

*L.S. Heath & Son, Inc. v. AT&T*, 9 F.3d 561, 567 (7th Cir.1993).

**2.** Incidentally, the court has already ruled that it does not have subject matter jurisdiction over this suit to the extent the plaintiff is asking the court to interpret church laws, policies or practices. To the extent that the articles can be construed as charging the plaintiff with dishonorable or unethical conduct, not related to religion per se, his claims will go forward. *See* doc. # 24.

Defendants moved for summary judgment claiming that: 1) Thompson is a limited purpose public figure who has failed to prove actual malice; 2) Thompson does not state a claim for invasion of privacy; and, 3) Thompson failed to give proper notice of the alleged defamation under Wis. Stat. § 895.05(2).[3]

## STANDARD FOR SUMMARY JUDGMENT

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In determining whether a genuine issue of material fact exists, courts must construe all facts in the light most favorable to the party opposing the motion and draw all justifiable inferences in favor of that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202 (1986). However, neither "the mere existence of some alleged factual dispute between the parties," *Anderson*, 477 U.S. at 247, 106 S.Ct. at 2510, nor the demonstration of "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986), will sufficiently demonstrate a genuine issue of fact. In that regard, the "mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient." *Anderson*, 477 U.S. at 252, 106 S.Ct. at 2512.

In *Anderson*, the Supreme Court made clear that the same burden of proof applies at the summary judgment stage as would

apply at trial. Therefore, if the court concludes that the plaintiff is a public figure, the plaintiff must set forth facts that would permit a reasonable finder of fact to conclude by clear and convincing evidence that the defendants published the defamatory statements with actual malice. *Anderson*, 477 U.S. at 255–56, 106 S.Ct. 2505.

## LEGAL AUTHORITIES

**1. The plaintiff is a limited purpose public figure**

 As an initial matter, the court must determine whether Thompson is a public figure.[4] An individual may be a public figure for all purposes due to general fame or notoriety. But, more commonly, one achieves the status of a public figure by involvement in a particular public issue or controversy. In these instances, the person becomes a public figure for a limited range of issues. *Wiegel v. Capital Times Co.*, 145 Wis.2d 71, 426 N.W.2d 43, 48 (Ct.App.1988). "Absent clear evidence of general fame or notoriety in the community, and pervasive involvement in the affairs of society, an individual should not be deemed a public personality for all aspects of his life." *Gertz v. Welch*, 418 U.S. 323, 352, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). But "an individual [who] voluntarily injects himself or is drawn into a particular public controversy thereby becomes a public figure for a limited range of issues." *Id.* at 351, 94 S.Ct. 2997.

 Neither side argues that Thompson is a general purpose public figure, even though there is evidence to support that conclusion.[5] Therefore, the court will focus on whether the plaintiff is a limited purpose public figure. This threshold issue is resolved by the

---

3. Because the court concludes that the plaintiff has not proven his defamation claim, the court does not reach this issue.

4. Whether a plaintiff is a public figure or simply a private person is a question of federal constitutional law and Supreme Court rulings are controlling. However, because the Supreme Court has not defined the contours of who constitutes a public figure and because states are entitled to provide a broader, though no more constricted, meaning to public figures, resort to Wisconsin case law is appropriate in this diversity action.

*Harris v. Quadracci*, 48 F.3d 247, 250 (7th Cir. 1995).

5. The plaintiff admits to achieving celebrity as one of Marquette University Coach Al McGuire's first star basketball players in the 1960's. He played professional basketball with Pittsburgh and Memphis of the American Basketball Association (ABA) and the Milwaukee Bucks of the National Basketball Association (NBA). *See* Thompson Affidavit, ¶ 10.

court as a matter of law, not by a jury as a question of fact. *Lewis v. Coursolle Broadcasting,* 127 Wis.2d 105, 377 N.W.2d 166, 168 (1985).

■ Wisconsin courts have adopted the "federal analysis" for determining whether a defamation plaintiff is a limited purpose public figure. Under this analysis, the court: (1) isolates the controversy at issue; (2) examines the plaintiff's role in the controversy to ensure that it is more than trivial or tangential; and, (3) determines if the alleged defamation was germane to the plaintiff's participation in the controversy. *Bay View Packing Co. v. Taff,* 198 Wis.2d 653, 543 N.W.2d 522, 531 (1995); *Van Straten v. Milwaukee Journal,* 151 Wis.2d 905, 447 N.W.2d 105, 108 (Ct.App.1989). The federal analysis deemphasizes the voluntariness of the plaintiff's involvement in the controversy, but retains the underlying presumption that a public figure plaintiff is usually one whose status ensures easy access to the media and the opportunity to rebut defamatory statements.

### a. With fears of NAFTA looming, Briggs & Stratton's decision to move jobs from Milwaukee constituted a public controversy.

■ The court must initially determine whether a public controversy existed. Dispositive of this issue is whether the dispute has "an impact outside of those immediately interested in the dispute." *Denny v. Mertz,* 106 Wis.2d 636, 318 N.W.2d 141, 148 (1982). The question is not whether the issue is only of 'general or public interest,' *Gertz,* 418 U.S. at 346, 94 S.Ct. 2997, or is merely "newsworthy." *Waldbaum v. Fairchild Publications,* 627 F.2d 1287, 1296 (D.C.Cir.1980). "[I]t must be a real dispute, the outcome of which affects the general public or some segment of it in an appreciable way." *Id.* Hence, "[i]f the issue was being debated publicly and if it had foreseeable and substantial ramifications for non-participants, it was a public controversy."

■ In this case, it is indisputable that a public controversy existed.[6] Beginning in the late 1980s, Briggs & Stratton, once the largest employer in metropolitan Milwaukee, began transferring jobs from its Milwaukee area plants to plants in Murray, Kentucky; Poplar Bluff, Missouri; and Juarez, Mexico. On May 17, 1994, in the wake of the North American Free Trade Agreement, the company announced the transfer of 2,000 Milwaukee area jobs to non-union locations in the southern United States while the corporation was earning record profits. Briggs & Stratton's decision to eliminate 2,000 Milwaukee jobs attracted widespread public comment and controversy, including pleas from community and religious leaders to reverse the decision.

### b. The plaintiff's role in the controversy was more than trivial or tangential.

As the Director and Vice–President of Corporate Communications for Briggs & Stratton, the plaintiff's role in this controversy is unquestionably more than trivial or tangential. During the period in question, the plaintiff frequently and publicly defended the company's layoff decisions. He was quoted in a number of publications before and after the National Catholic Reporter published its December 2, 1994, articles on Briggs' decision to move jobs out of the Milwaukee area.[7] *See* doc. # 33, p. 574, 582, 586, 592, 599 and 601; Defendant's Summary Judgment Appendix, Vol. 3, p. 860–865; Supp. Aff. of Laura Olsen Dugan, doc. # 54. Thompson's access to the media, as described above, as well as his job description, which includes public relations and media communications on matters involving Briggs & Stratton, strongly weigh in favor of finding that he is a limited purpose public figure.

### c. The alleged defamation was germane to the plaintiff's participation in the controversy.

Finally, the court must conclude that the editorial, article and graphics were germane

---

6. In fact, the plaintiff appears to concede this fact. *See* Defendant's Proposed Findings of Fact, ¶ 16, which is uncontroverted.

7. An individual who was once a public figure with respect to a controversy remains a public figure for latter commentary on that controversy. *Milsap v. Journal Sentinel, Inc.,* 100 F.3d 1265, 1269–70 (7th Cir.1996).

to the plaintiff's participation in the controversy. The articles were published to emphasize the social and economic consequences of job transfers, both with respect to Briggs & Stratton and other companies. The articles further emphasize that "Corporate America has responsibilities that go beyond the next quarter's profits." The plaintiff asserts that the defendants defamed him by implying that he was one of the parties responsible for transferring jobs from Milwaukee, and for the consequences of those job transfers. Because Thompson is a key public spokesperson and Vice President of Corporate Communications for Briggs & Stratton, the purportedly defamatory statements are germane to the plaintiff's participation in the controversy.

3. The plaintiff has failed to prove by clear and convincing evidence that the defendants published the article, editorial and graphics with actual malice

 Because the plaintiff is a public figure, Thompson must prove by clear and convincing evidence that the defendants acted with actual malice. *Masson v. New Yorker Magazine*, 501 U.S. 496, 508, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991). Actual malice exists if the defendants published defamatory statements with knowledge of their falsity or with reckless disregard for their truth. *New York Times v. Sullivan*, 376 U.S. 254, 280, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). Knowledge of falsity means that the defendants were actually aware that the publication was false. Reckless disregard of the truth or falsity of a publication occurred if the defendants "in fact entertained serious doubts as to [its] truth," *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968), or "a high degree of awareness of [its] probable falsity." *Garrison v. Louisiana*, 379 U.S. 64, 74–75, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964). As a result, proof of journalistic negligence is never enough. *St. Amant*, 390 U.S. at 733, 88 S.Ct. 1323.

As the Seventh Circuit has noted:

8. Constitutional defenses to defamation claims are irrelevant unless state law creates liability. *Underwager v. Salter*, 22 F.3d 730, 733 (7th Cir.

Probative evidence of recklessness includes a publisher's knowledge of serious factual inconsistencies, as well as his failure to investigate or independently verify disputed or questionable factual assertions. Recklessness may be found, for example, where there are clear reasons to doubt the truthfulness of the informant or the accuracy of his reports or where a story is fabricated by the defendant or is based entirely on an unverified anonymous telephone call. At the same time, proof of failure to investigate, by itself, is not sufficient to establish a publisher's reckless disregard for the truth or falsity of the challenged publication.

*Woods v. Evansville Press Co., Inc.*, 791 F.2d 480, 485 (7th Cir.1986).

 The plaintiff has failed to satisfy this standard. First, the plaintiff has not proven that the statements at issue are defamatory. There are three basic components of a defamatory communication in Wisconsin [8]:

 a. the statement is false;

 b. the statement is communicated by speech, conduct, or in writing to a person other the person defamed, and

 c. the communication is unprivileged and tends to harm one's reputation as to lower him in the estimation of the community or to deter third persons from associating or dealing with him.

Restatement (Second) of Torts § 559 (1977). Furthermore, "[i]n determining whether the language is defamatory, the words must be reasonably interpreted and must be construed in the plain and popular sense in which they would naturally be understood in the context in which they were used and under the circumstances they were uttered." *Tatur v. Solsrud*, 174 Wis.2d 735, 498 N.W.2d 232 (1993).

The plaintiff argues that the articles defamed him by implication by attributing the jobs transfers, as well as the social conse-

1994). Federal courts decide constitutional questions only when necessary. *Id.*

quences of those decisions, to him personally, and by questioning the morality of those decisions. More specifically, he asserts that the articles designated him as a "prominent Milwaukee Catholic," as well as a decision-maker and top player for Briggs & Stratton. As the parties concede, there is nothing inherently defamatory about calling someone a "prominent Milwaukee Catholic," or a decisionmaker or top player at Briggs & Stratton. Therefore, the court must examine whether the statements, when viewed in the context of the article, editorial and graphic, defame the plaintiff.

The court concludes they do not. Some of the purportedly objectionable phrases do not concern the plaintiff, and are not defamatory per se. *See Luthey v. Kronschnabl,* 239 Wis. 375, 1 N.W.2d 799, 801 (1942) ("certainty as to the person who is defamed must appear from the words themselves, for no innuendo can render certain that which is uncertain"). For example, the article does not state that Thompson is a prominent Milwaukee Catholic, only that he graduated from Marquette University. Similarly, the articles do not explicitly call Thompson a "decisionmaker" at Briggs & Stratton. Instead, he is referred to as Briggs & Stratton's Director of Corporate Communications and a "top player" in the controversy.

Furthermore, the plaintiff has failed to prove the falsity of some of the statements in the articles. *See Philadelphia Newspapers, Inc. v. Hepps,* 475 U.S. 767, 777, 106 S.Ct. 1558, 89 L.Ed.2d 783 (burden of proof to prove falsity on plaintiff). For example, Thompson states that there is no formal record that he was baptized in the Catholic church,[9] but concedes that he has attended Catholic services sporadically throughout his life. Furthermore, Thompson does not state unequivocally that he is not, and has never

considered himself, Catholic. Furthermore, the plaintiff has not established that he is not a top player in the controversy. As Briggs & Stratton's Vice President of Corporation Communications, Thompson regularly spoke publicly on behalf of the company defending its decision to move jobs. Under the circumstances, it is reasonable to conclude that George Thompson was a "top player" in the controversy.

Finally, the court concludes as a matter of law that no reasonable person could find that George Thompson was a decisionmaker at the company, responsible for the job transfers at issue and their social and economic consequences. This court does not believe that a rational person would think that Briggs & Stratton's public relations spokesperson was responsible for cutting 2,000 jobs at Briggs & Stratton. Hence, the plaintiff cannot establish his defamation claim.

■ Even if the articles are defamatory, the plaintiff has failed to prove by clear and convincing evidence that the defendants acted with actual malice. The plaintiff has submitted no evidence that the defendants, then or now, doubt the veracity of the articles. Nothing suggests that the defendants knew they were "writing falsehoods or feared that [they] might be doing so but barged ahead without checking." *Underwager v. Salter,* 22 F.3d 730, 735 (7th Cir.1994). There is no allegation that anyone, even Bill Lange, was misquoted. *See* Def. Proposed Findings of Fact, ¶ 69.

In fact, it is clear that the defendants thoroughly investigated the facts underlying the articles. Leslie Wirpsa wrote the article about Briggs & Stratton's layoff decision. Wirpsa reviewed news accounts of the controversy, spent four days in Milwaukee conducting nearly two dozen interviews, and

---

9. Paragraph 19 of Thompson's second amended complaint filed December 19, 1997, states he "was baptized in the Roman Catholic Church as an infant ..." This was disavowed during Thompson's deposition on January 5, 1998, when he says "there is no official record of that ... I guess my attorney just assumed that, he probably just made a mistake. I never told him that ... Well, I know I have not been officially baptized in the Catholic Church." However, Thompson concedes he has not checked St. Peter Claver Parish in New York, which he attended as a child to see if it has a baptismal record for him. *See* Sutton Affidavit (Doc. # 59), Ex. 4, at p. 46. In Thompson's affidavit, he adds that as a child he and his family frequently attended St. Peter Claver Roman Catholic Church, that he played Catholic Youth Organization basketball at the church, and that he also belonged to the boy scout troop at St. Peter Claver. *See* Thompson Affidavit, Doc. # 43, pp. 1–2.

compiled an extensive file of notes and published materials which she used in writing the news articles.

Furthermore, the defendants repeatedly attempted to get Thompson's comments on the story. Wirpsa requested interviews with Briggs & Stratton officials on several occasions before writing her story, but the company, by its spokesperson, Thompson, refused her requests. Neither did the company or Thompson respond to the newspaper's requests for news releases or any other information about the company's perspective on the controversy.

Before the article went to press, Wirpsa's immediate editor, Tom Roberts, called Briggs & Stratton in an effort to "do anything necessary—fly anywhere at any time—" to accommodate the company's representative in order to get Briggs & Stratton's side of the story. Thompson again refused comment. Based on the foregoing, this court is satisfied that there is not clear and convincing evidence that the defendants acted with actual malice.

4. The defendants are entitled to summary judgment on the plaintiff's invasion of privacy claim.

Finally, the plaintiff asserts that the defendants invaded his privacy under Wis. Stat. § 895.50(2)(c) [10]. The plaintiff asserts that the defendants invaded his privacy because he:

reasonably expected that his religious beliefs and adherence vel non thereto were private matters specifically with respect to 'the social teachings of the church.' Accordingly the investigation into the religious affiliation of the plaintiff and the publication of whether or not the plaintiff adhered to the 'social teachings of the church,' designating him as a 'prominent Milwaukee Catholic' who was a 'decisionmaker' at Briggs & Stratton and was

---

10. Wis. Stat. § 895.50(2)(c) states:
 (2) In this section, "invasion of privacy" means any of the following:
 (c) Publicity given to a matter concerning the private life of another, of a kind highly offensive to a reasonable person, if the defendant has acted either unreasonably or reckless-

'seemingly blind to consequences of (his) choices' constitute invasion of privacy.

Second Amended Complaint, ¶ 21.

It appears that these assertions attempt to bootstrap Thompson's defamation claim onto Wis. Stat. § 895.50. The court has already ruled that the articles do not state that Thompson is either Catholic or a decisionmaker at Briggs & Stratton. Similarly, the court finds that the articles do not state that Thompson violated the social teaching of the Catholic church, or is blind to the consequences of his choices. Because the purportedly objectionable phrases do not specifically identify Thompson, his invasion of privacy claim must fail.

Now, therefore,

IT IS ORDERED that the defendants' Motion for Summary Judgment (doc. # 28) and Supplemental Motion for Summary Judgment Dismissing Plaintiff's Second Amended Complaint (doc. # 51) are granted.

IT IS FURTHER ORDERED that this case is dismissed with prejudice.

ly as to whether there was a legitimate public interest in the matter involved, or with actual knowledge that none existed. It is not an invasion of privacy to communicate any information available to the public as a matter of public record.